The **ONEIDA INDIAN NATION OF NEW YORK; the Oneida Indian Nation of Wisconsin; and the Oneida of the Thames, Plaintiffs,**

and

**United States of America, Plaintiff–Intervenor,**

and

**The New York Brothertown Indian Nation, Plaintiff–Intervenor,**

v.

**The State of NEW YORK; County of Madison, New York; and County of Oneida, New York, Defendants.**

No. 74–CV–187.

United States District Court, N.D. New York.

March 29, 2002.

Thomas D. Barr, Rowan D. Wilson, Cravath, Swaine Law Firm, New York City, William W, Taylor, III, Caroline A. Judge, Zuckerman, Spaeder Law Firm, Washington, DC, John A. DeFrancisco, Harris, Beach Law Firm, Syracuse, NY, Thomas G. Rafferty, Cravath, Swain, New York City, Arlinda Locklear, nam, Office of Arlinda Locklear, Jefferson, MD, Daan Braveman, Ernest I. White Hall, Syracuse, NY, Carey R. Ramos, Robert S. Smith, Paul, Weiss Law Firm, New York City, William H. Pease, Asst. U.S. Atty., Office of the United States Attorney, Syracuse, NY, Charles Jakosa, nam, Asst. U.S. Atty., Steven Miskinis, U.S. Dept. of Justice, Indian Resources Section Environment and Natural Resources Division, Washington, DC, Charles E. O' Connell, Jr., Asst. U.S. Atty., U.S. Department of Justice Environment & Natural Resources Division, Washington, DC, Michael G. Sterthous, Whiteman, Osterman Law Firm, Albany, NY, for Plaintiffs.

G. Robert Witmer, Jr., Nixon, Peabody Law Firm, Rochester, NY, David A. Reiser, phv, Zuckerman, Spaeder Law Firm, Washington, DC, David B. Roberts, Office of Attorney General State of New York, Albany, NY, Christopher W. Hall, Office of Attorney General State of New York, Albany, NY, for Defendants.

### MEMORANDUM–DECISION AND ORDER

KAHN, District Judge.

### BACKGROUND

#### I. Factual Background

This action is brought by three Indian nations, the Oneida Indian Nation of New York, the Oneida Indian Nation of Wisconsin and the Oneida of the Thames (collectively, the "Oneidas" or "Plaintiffs"), who claim to be descendants of the original

Oneida Indian Nation that inhabited land in what is now central New York State "from time immemorial to shortly after the Revolution." *County of Oneida* v. *Oneida Indian Nation of New York*, 470 U.S. 226, 230, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985). The Oneidas bring this action in order to regain possession of approximately 250,000 acres of land in New York State that they claim was unlawfully taken from the Oneida Indian Nation by New York State.

The Oneidas' troubles with New York State, for purposes of this action, began in 1788 with the Treaty of Ft. Schuyler, in which the State purchased the majority of the Oneidas' aboriginal land and left the Oneidas with a reservation of approximately 300,000 acres in central New York State. In 1794, in the Treaty of Canandaigua, the United States recognized that the Oneida Indian Nation had been granted this reservation of land in New York State. In this action, the Oneidas allege that following the Treaties of Ft. Schuyler and Canandaigua, New York State proceeded to illegally purchase for itself the Oneida Indian Nation's reserved land. Specifically, the Oneidas challenge the validity of 30 land transactions entered into by the Oneida Indian Nation and New York State between 1795 and 1846. In these transactions, the original Oneida Indian Nation sold portions of the land reserved to it in the Treaties of Ft. Schuyler and Canandaigua to New York State. The Oneidas' current claim is based on their argument that these transactions are barred by the 1793 Nonintercourse Act, 25 U.S.C. § 177, that prohibits the conveyance of Indian land without the express approval of the federal government.

## II. *The "Test Case"*

In 1970, the Oneidas filed suit in the Northern District of New York against Madison an Oneida Counties (the "Counties") challenging the validity of a 1795 land transaction in which the Oneida Indi-

an Nation sold a large part of its original land reservation to New York State. In this action, titled *Oneida Indian Nation of New York v. County of Oneida* (the "test case"), the Oneidas sought the fair rental value for a two-year period of portions of the disputed land now occupied by the Counties. The test case was initially dismissed by the district court for lack of federal jurisdiction, and this decision was affirmed by the Second Circuit. *See Oneida Indian Nation of New York v. County of Oneida*, 464 F.2d 916 (2d Cir.1972). However, the Supreme Court reversed, finding that the Oneidas' claim asserted a federal controversy because Indian possessory rights to tribal lands are governed by federal law. *See Oneida Indian Nation of New York v. County of Oneida*, 414 U.S. 661, 667, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) ("*Oneida I* ").

The district court judge conducted a bench trial in the test case and found that the 1795 land transfer did violate the Nonintercourse Act. *See Oneida Indian Nation of New York v. County of Oneida*, 434 F.Supp. 527 (N.D.N.Y.1977) ("*Oneida Test Case* "). This ruling was affirmed by the Second Circuit and the Supreme Court. *See Oneida Indian Nation of New York v. County of Oneida*, 719 F.2d 525 (2d Cir. 1983) ("*Oneida Test Case—Circuit* "); *County of Oneida v. Oneida Indian Nation of New York*, 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) ("*Oneida II* ").

The test case involved facts and legal theories quite similar to those present in this action. In fact, many of the legal theories and defenses set forth by the parties in this action were discussed extensively by the courts issuing decisions in the test case. The fundamental difference between the two actions lies in their scope. While the test case dealt with only one transaction and a smaller area of land, this action concerns a series of transactions

over several years and a much larger area of land. In addition, while the plaintiffs in the test case are identical to Plaintiffs in this action, New York State was not a defendant in the test case, and the United States and the New York Brothertown Indian Nation did not intervene in the test case.

Following *Oneida II,* the test case was remanded to the district court for further consideration of the Counties' claimed offset against damages. The test case is currently pending in the Northern District of New York before Judge McCurn.

### III. *Procedural History*

This action was filed by Plaintiffs in 1974 against the Counties and essentially lay dormant for many years while the Plaintiffs actively pursued the test case and while the parties engaged in extensive settlement discussions. In 1998, the United States was permitted to intervene as a plaintiff. In September 2000, Judge McCurn permitted Plaintiffs and the United States to amend their Complaints to add New York State as a defendant and the Oneida of the Thames as a plaintiff. In that same decision, Judge McCurn denied Plaintiffs' motion to add private landowners as defendants. In May 2001, this Court permitted the Brothertown Indian Nation to intervene in this action. The Brothertown claim that the Oneidas granted them a portion of the land at issue in this action in a 1774 treaty between the two nations. They further claim that their right to this land was recognized in the 1794 Treaty of Canandaigua. The Brothertown have intervened in this action in order to protect their rights to this parcel of land.

### IV. *Motions Before The Court*

In November 2001, the parties presented oral argument on several motions to the Court. This decision addresses eight of those motions.[1] In this decision the Court addresses (1) Defendants' motion to dismiss for nonjoinder of indispensable parties, (2) Plaintiffs' motion to strike Defendants' defenses, (3) the United States' motion to strike Defendants' defenses, (4) Brothertown's motion to strike Defendants' defenses, (5) Plaintiffs' motions to dismiss Defendants' counterclaims, and (6) the United States' motions to dismiss Defendants' counterclaims.

## *DEFENDANTS' MOTION TO DISMISS*

### I. *Standard*

Federal Rule of Civil Procedure 19(a) first requires the Court to determine whether an absent party is necessary to the action. An absent party is necessary and shall be joined in the action if:

(1) in the person's absence complete relief cannot be accorded among those already parties; or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. Proc. 19(a).

Defendants contend that the New York Brothertown Indian Nation, the Brothertown Indian Nation of Wisconsin, the Marble Hill Oneida Indians, and the Iroquois Confederacy are all necessary parties to

---

1. The Court will address the United States' motion for leave to amend its Amended Complaint at a later date.

this action. Defendants urge the Court to either compel these parties to join in the action or dismiss the action under Rule 19 for failure to join indispensable parties.

■ The facts presented to the Court do not support a finding that any of the absent parties are necessary parties under Rule 19(a)(1). The absence of these parties will not result in a denial of complete relief to the parties currently present in this action. *See Arkwright–Boston Mfrs. Mut. Ins. Co. v. City of New York,* 762 F.2d 205, 209 (2d Cir.1985) (stating that Rule 19(a)(1) does not contemplate relief that might be awarded to the absent party, but only whether the parties already present can be awarded full relief). There is no reason why the current parties cannot be awarded complete relief without the addition of the absent parties.

This leaves the Court to examine Defendants' claims under Rule 19(a)(2) and to determine whether the absent parties in fact claim an interest relating to the subject of this action. If the absent parties do in fact claim an interest in this action, the Court must determine whether deciding this action in their absence would impair their ability to protect that interest or leave Defendants open to the possibility of multiple suits and inconsistent judgments. The Court will analyze Defendants' Rule 19(a)(2) claims separately for each absent party.

## II. *New York Brothertown Indian Nation*

On May 21, 2001, the Court granted the New York Brothertown Indian Nation's motion to intervene in this action. Because the New York Brothertown Indian Nation is a party to this action, Defendants' motion as to it is moot.

## III. *Brothertown Indian Nation of Wisconsin*

■ The Brothertown Indian Nation of Wisconsin has expressly disavowed any interest in the land involved in this action. The Wisconsin Brothertown have submitted an affidavit stating that their land claim, under the Treaty of Fort Schuyler, is outside of and to the east of the land at issue in this action. Because the Wisconsin Brothertown have specifically disavowed any interest in the land at issue in this action, they are not a necessary party for Rule 19 purposes. *See Oneida Indian Nation of New York v. Madison County,* 145 F.Supp.2d 268, 270 (N.D.N.Y.2001) (denying defendants' motion to dismiss for Rule 19 nonjoinder of an indispensable party and finding that the absent party itself is the "best judge of whether it [has] an interest in the subject" of the action); *ConnTech Dev. Co. v. University of Conn. Educ. Properties, Inc.,* 102 F.3d 677, 683 (2d Cir.1996) ("It is the absent party that must claim an interest for Rule 19(a)(2) purposes.") (citations and internal quotations omitted).[2]

2. Defendants make much of the statement in the Wisconsin Brothertown's Affidavit that "[a]ny claims to Brothertown lands in New York State rightfully belong to the Brothertown Indians of Wisconsin as the sole successor in interest to the lands under the 1788 Treaty of Fort Schuyler." Judge Aff., Ex. 1. The Court does not find this statement to be an indication of interest in this lawsuit by the Wisconsin Oneidas. The fact that the Wisconsin Brothertown express an interest in a hypothetical portion of land in New York State (while simultaneously disavowing any interest in the land at issue in *this* action) is not relevant to the disposition of Defendants' motion. The Court's decision with respect to Defendant's motion is based on the fact that the New York Brothertown have expressed an interest in the land at issue in this action and have been permitted to intervene to protect this right, while the Wisconsin Brothertown have expressly disavowed any such interest.

## IV. *Marble Hill Oneida Indians*

On November 7, 2001, the Marble Hill Oneidas moved to intervene in this action. Through their request for intervention, the Marble Hill Oneidas have indicated that they claim an interest in the land at issue in this action. Therefore, the Court must determine whether this purported interest would be impaired if this suit were to continue in their absence or if it would leave Defendants open to multiple or inconsistent obligations. The Court finds that it would not.

■ Any interest that the Marble Hill Oneidas might have in this action would not be impaired if the suit continued in their absence. Furthermore, leaving the Marble Hill Oneidas out of this action would not leave Defendants open to multiple or inconsistent obligations. The Marble Hill Oneidas are official members of the Oneida Indian Nation of New York, a Plaintiff in this action. Any interest they might have in this action is identical to that of the New York Oneidas and is represented by the New York Oneidas. *See Canadian St. Regis Band v. New York,* 573 F.Supp. 1530, 1533 (N.D.N.Y.1983) (finding that "whatever title the Indians have is in the tribe, and not in the individuals") (citations omitted). It was for this very reason that the Marble Hill Oneidas were denied intervention in the test case by Judge Port. *See Oneida Indian Nation of New York v. County of Oneida,* 70–CV–35, June 17, 1979 Order at 4 (finding that the Oneida Plaintiffs adequately represented the Marble Hill Oneidas' individual interest in the action), *aff'd* 620 F.2d 285 (2d Cir.1980). The interests of the Marble Hill Oneidas are fully represented by the tribe of which they are a member, the New York Oneidas. The presence of the Marble Hill Oneidas in this action is therefore not necessary.[3]

## V. *Iroquois Confederacy*

Defendants contend that the Confederacy has asserted a claim relating to the subject matter of this action. In support of this contention, Defendants cite a statement by the Confederacy asserting that it "is the only legitimate body authorized to conduct land transactions" on behalf of the Six Nations that make up the Confederacy.[4] Roberts Aff., Ex. 14. Defendants also quote the Confederacy as stating that the territories of its constituent nations "became Confederacy land" and "must be dealt with legally by the Council of Chiefs of the Confederacy." Roberts Aff., Ex. 16. Plaintiffs argue that the Confederacy has specifically disavowed any interest in the current action and that the statements cited by Defendants are antiquated and irrelevant to this action.

■ The Court finds that the Confederacy has not in fact claimed an interest in the subject matter of this action or in the action itself. *See Zwack v. Kraus Bros. & Co.,* 93 F.Supp. 963, 966 (S.D.N.Y.1950) (finding that where the existence of an absent party's interest is disputed, the Court must make an appraisal of the substantiality of such interests). The Defendants' attempt to assert an interest in this action on behalf of the Confederacy is insufficient under Rule 19(a)(2). *See Conn-Tech Dev. Co. v. University of Conn.Educ. Properties, Inc.,* 102 F.3d 677, 682 (2d

---

**3.** It is doubtful that the Marble Hill Oneidas, as individual tribe members, would even be eligible to pursue a land claim under the Nonintercourse Act. *See Canadian St. Regis Band,* 573 F.Supp. at 1533 (dismissing land claims by individual members of Indian tribe because claims on the part of individual Indians or their representatives are not cogniza-ble in federal courts under the Nonintercourse Act).

**4.** The Confederacy is a governing body comprised of the following six Indian nations: Oneida, Seneca, Cayuga, Onondaga, Mohawk and Tuscarora.

Cir.1996) (stating that it is the absent party that must itself claim an interest under Rule 19(a)(2)).

The Confederacy's conduct with regard to Indian land claim actions stands in direct contradiction to its previous statements as cited by Defendants. The statements cited by Defendants on behalf of the Confederacy were, for the most part, made decades ago and have certainly not been acted upon by the Confederacy in the years since, at least not in the context that confronts the Court in this action.[5] Several Indian land claim cases involving the constituent tribes of the Confederacy have proceeded in the federal courts without the Confederacy. *See, e.g., Cayuga Indian Nation v. Cuomo,* Nos. 80–CV–930 & 80–CV–960 (N.D.N.Y.); *Seneca Nation v. New York,* 85–CV–411C & 93–CV–0688 (W.D.N.Y.); *Canadian v. St. Regis v. New York,* 82–CV–783 (N.D.N.Y.). Neither the courts nor the Confederacy itself have ever suggested that the Confederacy's presence was necessary in those actions. Furthermore, the Confederacy has not attempted to intervene in any of these actions in order to assert the purported interests that Defendants ascribe to it.

Since the Confederacy has sought to intervene in cases where it has an interest, its failure to intervene in the many Indian land claim cases involving its constituent nations supports a finding that the Confederacy does not have an interest in those actions, nor in the action before this Court. *See Oneida Indian Nation of Wis. v. State of New York,* 732 F.2d 261, 265 n. 6 (2d

Cir.1984) (recognizing that the Seneca Nation "has conducted recurrent and successful litigation in its own right in the federal courts, without [Confederacy] participation and with no deference shown to Gayanera-kowa [Confederacy law]").

The Confederacy has also submitted an affidavit in this action, specifically indicating that it has no objections to this case going forward in its absence. *See* Judge Aff., Ex.2. While this affidavit does not specifically state that the Confederacy has no interest in this action, it does contradict the Confederacy's prior statements in other contexts implying that it is the sole arbiter of land claim disputes for its constituent tribes. The Court finds the Confederacy's lack of objection to this action persuasive and consistent with the evidence discussed above indicating that the Confederacy claims no real interest in this action.

In summary, there is no indication, based on the evidence submitted to the Court, that the Confederacy has any real interest in the land at issue in this action. The statements attributed to the Confederacy by the Defendants about the Confederacy's power of government over the Oneidas and its other constituent nations are belied by the Confederacy's own actions and the actions of its constituent nations. The Confederacy's failure to participate in similar Indian land claim actions and its lack of objection to this action are also telling. Because the Confederacy has no real interest in this action, it is not a necessary party under Rule 19.[6]

---

**5.** The Confederacy did assert its land claim interests in *Oneida Nation of Wisconsin v. State of New York,* 732 F.2d 261 (2d Cir.1984), and was permitted to intervene in that action, but the circumstances in that case were different than those present here The Confederacy intervened in that case with five of its constituent Indian nations, all of whom had competing interests in the huge tract of land at issue in that action. Here, the land claim at issue

is solely that of the Oneidas. There are no competing claims to the land among the other constituent nations of the Confederacy.

**6.** Because the Court finds that none of the absent parties are necessary parties under Rule 19(a), it need not determine whether the absent parties are indispensable under Rule 19(b).

## PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' AFFIRMATIVE DEFENSES

### I. *Standard*

 Motions to strike affirmative defenses under Rule 12(f) of the Federal Rules of Civil Procedure are not generally favored. Despite a general disfavor for motions to strike, courts should grant these motions when the defenses presented are clearly insufficient. Motions to strike have been found to "serve a useful purpose by eliminating insufficient defenses and saving the time which would otherwise be spent in litigating issues that would not affect the outcome of the case." *Simon v. Manufacturers Hanover Trust Co.*, 849 F.Supp. 880, 882 (S.D.N.Y.1994) (internal citations and quotations omitted). They are to be granted only when "it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense." *Salcer v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2d Cir.1984), *vacated on other grounds*, 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986). In deciding a Rule 12(f) motion, a court "must accept the matters well-pleaded as true and should not consider matters outside the pleadings." *County Vanlines, Inc. v. Experian Info. Solutions, Inc.*, 205 F.R.D. 148, 152 (S.D.N.Y.2002) (internal quotations omitted).

 Even when the facts are not in dispute, it is generally accepted by courts of this Circuit that it is not appropriate to decide substantial issues of law on a motion to strike. *See Salcer*, 744 F.2d at 939. This is particularly true where there has been little or no discovery, as in the present case.

 Additionally, in order to grant a motion to strike a defense, the inclusion of the defense must result in prejudice to the plaintiff. *See S.E.C. v. Toomey*, 866 F.Supp. 719, 722 (S.D.N.Y.1992). The requirement of prejudice to the plaintiff may be satisfied if the inclusion of the defense would result in increased time and expense of trial, including the possibility of extensive and burdensome discovery. *See id.* at 722. That element of prejudice is certainly present in this extremely complicated action that has already been pending for well over two decades. *See Mohegan v. Connecticut*, 528 F.Supp. 1359, 1362 (D.Conn.1982) (granting a motion to strike in an "extraordinarily complex" action and concluding that "[t]he legal issues presented by [the] defenses would greatly complicate the pre-trial process" and that "early resolution of defenses that could not possibly prevent recovery by the plaintiff will facilitate the orderly progress of this protracted litigation towards either trial or settlement") (internal quotations omitted).

In this action, Plaintiffs argue that Defendants have asserted several defenses that are insufficient both legally and factually. In all, Plaintiffs challenge the validity of 37 affirmative defenses raised by the State and 32 affirmative defenses raised by the Counties.

### II. *Defenses*

#### A. *Plaintiffs' Standing* [7]

 Defendants challenge the Plaintiffs' standing to bring this action. To bring a claim under the Nonintercourse Act, a plaintiff must show that it is or represents an Indian tribe within the meaning of the Act. *See Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58 (1994). Defendants dispute Plaintiffs' assertion that they are the successors in interest to the original Oneida Indian Nation or to the factions of the Oneida Nation that entered into the land transactions at issue in this

**7.** Counties' Defenses 1–4. State's Defenses 24–27.

action. Plaintiffs contend that their standing has been conclusively determined through government recognition of their tribal status and by the findings of the courts in the test case. Because the test case concerned the same plaintiffs and the same type of claim present in this action, Plaintiffs argue that there are no outstanding factual or legal questions as to their standing to bring this action. Therefore, Plaintiffs argue that Defendants' standing defense should be stricken as legally insufficient.

### 1. *The Test Case*

All three Plaintiffs in this action were plaintiffs in the test case, in which Plaintiffs sued the Counties under the Nonintercourse Act, challenging a 1795 land transaction between the Oneida Nation and the State of New York. In the test case, Judge Port explored extensively the tribal status of all three Oneida Plaintiffs. *See Oneida Indian Nation of New York v. County of Oneida*, 70–CV–35, Transcript of Proceedings on Nov. 12–13, 1975. After a full presentation of evidence from both sides, and after considering the tribal status factors outlined in *Mashpee Tribe v. Town of Mashpee*, 447 F.Supp. 940 (D.Mass.1978), *aff'd*, 592 F.2d 575 (1st Cir. 1979), Judge Port found that all three tribal plaintiffs, including the Oneida of the Thames, were "direct descendants" of the original Oneida Nation. *Oneida Test Case*, 434 F.Supp. 527, 538 (N.D.N.Y.1977). Judge Port's finding was directly acknowledged by the Second Circuit and the Supreme Court in their review of the case. *See Oneida Test Case—Circuit*, 719 F.2d 525, 539 (2d Cir.1983) (observing that "[t]he district court found that the three plaintiffs are the direct descendants of the Oneida Indian Nation"); *Oneida II*, 470 U.S. 226, 230, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (identifying the Oneida plaintiffs as "direct descendants of members of the Oneida Indian Nation").

The acceptance by the courts in the test case of Plaintiffs' standing to sue under the Nonintercourse Act has a significant effect on this action. The material components of Plaintiffs' claims in both actions, the treaties upon which their claims are based, and the statute they alleged was violated are identical. Because the factual and legal issues arising in this action and the test case are nearly identical, the Court cannot see how Plaintiffs could be found to have standing in the test case but somehow not be found to have standing in this action. In fact, Defendants have raised no issues of fact with regard to Plaintiffs' assertions that they are successor tribes to the Oneida Indian Nation or that they currently exist as tribes in their own right. They have instead concentrated their argument on asserting that the determination of Plaintiffs' standing made by the courts in the test case is not applicable to this action. A challenge to Plaintiffs' standing at this point is only possible if there exists some material difference between the two cases that would make this Court's determination of standing different from that of Judge Port.

The one difference between this action and the test case, for purposes of Plaintiffs' standing, is the number of transactions alleged to be in violation of the Nonintercourse Act. In the test case the Oneida Plaintiffs challenged the validity of only one transaction. In this action they challenge the validity of twenty-six different transactions. Defendants contend that Plaintiffs' standing in this action (unlike the test case) requires them to prove their connection to the original Oneida Indian Nation or to factions of the original Oneida Indian Nation at all twenty-six points in time when the disputed land transactions were consummated.

The Court rejects this contention. The rights alleged by Plaintiffs in this action do

not involve the rights of the individual groups or sects of Oneida Indians that Defendants allege completed the disputed land transactions with the State of New York. The rights alleged by Plaintiffs are rights protected by the Nonintercourse Act for the Oneida Indian Nation and its successors as a whole. Plaintiffs allege that these rights stem not from treaties signed with individual sects or factions of the original Oneida Indian Nation, but from the 1794 Treaty of Canandaigua, which preserved land for the whole of the Oneida Indian Nation. Indeed, the United States government, in later dealings with the Oneidas, treated the Oneidas as one nation.[8] *See* Treaty of Buffalo Creek, Jan. 15, 1838, U.S.-New York Indians, art. 2, 7 Stat. 550. The claims asserted by Plaintiffs are matters of collective tribal ownership. It would defy logic to force the Plaintiffs in this action to trace their lineage back to individual members or factions of the original Oneida Nation at particular points in time when Plaintiffs' claim concerns rights granted to the Oneida Indian Nation as a whole and is based on a statute granting protection to entire Indian nations.

Because there is no material difference for purposes of standing between this case and the test case, the Court will give significant weight to the determination by Judge Port that Plaintiffs are direct descendants of the original Oneida Indian Nation.

### 2. *Federal Recognition*

There is no dispute among the parties that both the New York Oneidas and the Wisconsin Oneidas are federally recognized tribes. The Bureau of Indian Affairs ("BIA") began a formal program of tribal recognition in 1978. Through this program, the BIA makes a determination, based on the modern Indian tribe's history and lineage, as to whether the modern tribe is indeed a successor in interest to an ancient Indian tribe. The New York and Wisconsin Oneidas are considered by the United States government to be successors in interest to the original Oneida Indian Nation.

Courts have consistently found that recognition of a tribe by the United States government is to be given substantial weight in determining an Indian plaintiff's tribal status for Nonintercourse Act claims. *See, e.g., Cayuga Indian Nation v. Cuomo,* 667 F.Supp. 938, 942 (N.D.N.Y. 1987) (finding that federal recognition of tribal status is to be accorded "great significance" in determining standing under the Nonintercourse Act); *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 582 (1st Cir.1979) (acknowledging that courts have generally been able to accept tribal status as a given on the basis of the doctrine that the courts will accord substantial weight to federal recognition of a tribe); *see also Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 60 (2d Cir.1994) ("[T]he BIA is better qualified by virtue of its knowledge and experience to determine at the outset whether Golden Hill meets the criteria for tribal status. This is a question at the heart of the task assigned by Congress to the BIA and should be answered in the first instance by that agency.").[9] In *Cayuga v. Cuomo,* the

---

8. The United States' post–1805 treatment of the Oneidas as a unified nation specifically runs counter to Defendants' insistence that the Court consider the Plaintiffs' connections to two Oneida factions created in 1805, known as the "Christian Party" and the "Pagan Party," in order to establish standing.

9. At least one court has even gone so far as to suggest that courts have little or no role to play in determining tribal status once the executive branch has made such a determination. *See Oneida Indian Nation of New York v. State of New York,* 520 F.Supp. 1278, 1301 (N.D.N.Y.1981) (stating that whether the trib-

court gave great deference to the government's recognition of the tribal plaintiffs and found it unnecessary to consider the factors applied in *Mashpee*, 592 F.2d at 582, since the *Cayuga* plaintiffs, unlike the *Mashpee* plaintiffs, were federally recognized tribes. *See Cayuga*, 667 F.Supp. at 943. The *Cayuga* court concluded that based on the explicit federal recognition of the Plaintiff tribes as successors in interest to the original Cayuga Indian Nation, it had "little hesitation in holding that there is no genuine issue of material fact regarding [their] tribal status." *Id.* The Court finds the reasoning of the court in *Cayuga v. Cuomo* to be applicable to this action.

### 3. *The Mashpee Case*

Defendants contend that the Court should apply the factors outlined in *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575 (1st Cir.1979), and require Plaintiffs to prove their continuous tribal existence by showing that the Oneida Indian Nation existed as a tribe at the time of each land transaction at issue in this action. In support of this contention, Defendants have asked the Court to take judicial notice of several statements concerning the Oneida Indian Nation's tribal existence, one by a court in 1877 and the others by assorted

federal bureaus in the late nineteenth and early twentieth centuries. These statements include a citation to the 1892 census, which Defendants note contains no map of the Oneida reservation, a 1906 report from the Department of the Interior stating that the New York Oneida "can hardly be said to maintain a tribal existence," and a quotation from a book about the Wisconsin Oneida in which is chronicled the Wisconsin Oneidas' loss of land and governing power to white society.[10] Defs. Br. at 21–22; Schraver Aff., Exs. 2–5, 8–9.

Even if the Court were to take judicial notice of these statements, they would have no effect on Plaintiffs' standing in this action. There is no need to require Plaintiffs to prove their tribal existence at the time of each relevant land transaction, as required in *Mashpee*, because unlike the *Mashpee* plaintiffs, two of the Oneida Plaintiffs have been federally recognized and the standing of all three Plaintiffs to bring a claim under the Nonintercourse Act has been accepted by previous courts.[11] The *Mashpee* plaintiffs were a United States based tribe who were not recognized by the United States government. They had not previously brought a claim in which their standing and tribal status had been explicitly recognized. The *Mashpee* court was therefore forced to

---

al plaintiffs are the proper parties is to be resolved through executive determinations of tribal status whenever possible), *aff'd in part and rev'd in part*, 691 F.2d 1070 (2d Cir.1982); *but see Golden Hill*, 39 F.3d at 57 ("[T]ribal status for purposes of obtaining federal benefits is not necessarily the same as tribal status under the Nonintercourse Act.").

**10.** Defendants' argument that Plaintiffs lack standing in part because they lack land and tribal government is contradictory, since Plaintiffs are asserting in this action that they were deprived of this very land by the state of New York. In challenging Plaintiffs' standing on this basis, Defendants are asking the Court to find that Plaintiffs are not tribes because they possessed no land in New York, even

though Plaintiffs are alleging that their New York land was unlawfully taken from them by New York itself.

**11.** All of the cases cited by Defendants in support of their argument that Plaintiffs should be required to prove continuous tribal existence and their connection to the ancient Oneidas at several different points in time are cases in which the tribes at issue were not federally recognized tribes and in which the issue of plaintiffs' standing to bring a land claim was being decided for the first time. *See, e.g., Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575 (1st Cir.1979); *Canadian St. Regis Band of Mohawk Indians v. New York*, 146 F.Supp.2d 170, 184 (N.D.N.Y.2001).

consider other evidence of tribal status to determine the plaintiffs' standing. This is not analogous to the situation facing this Court. In a case like this one, where the Plaintiffs' standing under the Nonintercourse Act has been accepted in a previous action and in which two of the Plaintiff tribes are federally recognized, Plaintiffs have standing as a matter of law.[12]

The facts outlined in the pleadings and the law governing standing in Indian land claim actions do not support a defense challenging Plaintiffs' standing in this action. In addition, the prejudice that would result to Plaintiffs by forcing them to respond to burdensome discovery requests on an issue which is not legitimately in dispute argues in favor of striking the defense. Defendants' standing defenses are therefore stricken.

B. *Disestablishment, Diminishment and Ft. Schuyler* [13]

These defenses are discussed below as part of the Court's discussion of Plaintiffs' and the United States' motions to dismiss Defendants' counterclaims. *See* discussion *infra* p. 130, Part II. In accordance with that discussion, Defendants' disestablishment and diminishment defenses remain and the Ft. Schuyler defense is stricken.

C. *Ratification and U.S. Consent* [14]

Defendants contend that ratification of the land transactions at issue in this action can come from a number of federal sources and that Plaintiffs are required under the Nonintercourse Act to prove that the United States never consented to the alienation of their land. Plaintiffs counter that ratification of the disputed land transactions must be by federal statute or treaty, and that Defendants' failure to plead the existence of any such statute or treaty causes their ratification defenses to fail.

■■■ While the law is clear that congressional intent to terminate title to Indian land must be plain and unambiguous, *see Oneida II*, 470 U.S. at 247, it is far from clear that ratification of Indian land transactions must necessarily be by treaty or statute. *See, e.g., Seneca Nation of Indians v. State of New York*, 26 F.Supp.2d 555, 571 (W.D.N.Y.1998) (finding that federal ratification of an Indian land transaction must be explicit but not necessarily by federal treaty or statute); *Oneida Test Case—Circuit*, 719 F.2d at 539 (same); *Cayuga Indian Nation of New York v. Cuomo*, 667 F.Supp. 938, 944–45 (N.D.N.Y.1987) (same). In *Cayuga v. Cuomo*, the court found that a complete factual record of the land transactions at issue was necessary prior to a determination of whether the land transactions had indeed been ratified by the federal government.[15] *Cayuga v. Cuomo*, 667 F.Supp. at

---

**12.** The Court recognizes that the Oneida of the Thames is based in Canada, and is thus unable to obtain U.S. recognition. However, it appears to be undisputed by the parties that the Oneida of the Thames is recognized by Canada.

The Court also notes that some of Defendants' own statements, provided in their brief, seem to argue in favor of a finding that the Oneida of the Thames is indeed a successor tribe to the ancient Oneidas. *See* Def. Br. n. 20 (quoting a book that describes the path taken by the Thames Oneida from New York to Canada).

**13.** Counties' defenses 7 and 23. State's defenses 28 and 33–34.

**14.** Counties' defenses 5–6. State's defenses 4–5.

**15.** After two years of discovery, the court determined that the transactions had not been federally ratified. *Cayuga Indian Nation of New York v. Cuomo*, 730 F.Supp. 485, 485 (N.D.N.Y.1990).

944–45. In light of the uncertainty of the law in this area and the lack of facts before the Court supporting either party's position, substantial issues of law and fact relating to this issue remain unresolved. It would therefore be inappropriate to strike the Defendants' ratification defenses at this time.

### D. Adequacy of Consideration, Estoppel, Estoppel by Sale, Bona Fide Purchaser and Payment [16]

Defendants contend that the equitable remedies of adequacy of consideration, estoppel, estoppel by sale, bona fide purchaser, and payment are available to them under federal law. Plaintiffs contend that if Defendants are found to have violated the Nonintercourse Act, these defenses are not available because under the Nonintercourse Act the land transactions at issue can only be validated by federal ratification.

 These defenses rely on the principle that conduct by Plaintiffs or Defendants can validate Indian land transactions even if those transactions were not approved by the United States as required by the Nonintercourse Act. By prohibiting land transactions with Indians that were not sanctioned by the United States, the Nonintercourse Act precludes inquiry into the fairness of the transactions. See Oneida Test Case, 434 F.Supp. at 541 ("By prohibiting all unauthorized dealings with Indians, [the Nonintercourse Act] cuts off any inquiry into the fairness of such dealings insofar as the validity of the resulting transfer is concerned."). In other words, even if the land transactions are somehow shown to be fair in price, as these defenses would allow, they would still be unlawful under the Nonintercourse Act unless approved by the United States. See id. at

530 ("Although the present owners of the [land] may have acted in good faith when acquiring their property, such good faith will not render good a title otherwise not valid for failure to comply with the Nonintercourse Act."). Thus, as a matter of law, the defenses of bona fide purchaser, adequacy of consideration, estoppel, estoppel by sale, and payment are unavailable to Defendants, at least for purposes of determining Defendants' liability. See Cayuga Indian Nation v. Cuomo, 565 F.Supp. 1297, 1301–02 (N.D.N.Y.1983) (striking the defenses of estoppel and estoppel by sale in Indian land claim action arising under the Nonintercourse Act); Seneca Nation of Indians v. State of New York, 93–CV–688A, 1994 WL 688262, at *5 (W.D.N.Y. Oct. 28, 1994) (same).

However, as Defendants note, the defenses of adequacy of consideration, payment and bona fide purchaser may be relevant to a determination of damages. These defenses remain for the limited purpose of determining damages.

### E. Mitigation [17]

Defendants contend that delay in bringing a case to trial can be seen as failure to mitigate and can affect the value of the land in question. Plaintiffs argue that mitigation is simply laches by another name and that delay-based defenses are not permissible in suits brought by Indian tribes under the Nonintercourse Act.

 The defense of mitigation is not relevant to Defendants' liability. Defendants cannot rely on Plaintiffs' delay in bringing suit to escape liability in this action. See discussion infra p. 123, Part II.G. However, the defense of mitigation is relevant to issue of damages in this action.

---

**16.** Counties' defenses 8, 13 and 20. State's defenses 10, 13 and 29.

**17.** Counties' defense 9. State's defense 3.

The defense will therefore remain for the limited purpose of determining damages.

### F. *Collateral Estoppel* [18]

■ Collateral estoppel, or issue preclusion, bars a party from relitigating an issue that was "actually litigated and necessary to the outcome" of a prior adjudication. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Defendants argue that determinations made by the Indian Claims Commission ("ICC") and the Court of Claims, in actions brought before those courts by Plaintiffs, preclude Plaintiffs from re-litigating the same issues in this action.

In *Cayuga Indian Nation of New York v. Cuomo*, 667 F.Supp. 938 (N.D.N.Y.1987), the court found that prior findings of the ICC regarding the United States' knowledge of certain treaties between the plaintiff Indians and the State of New York did not bar the *Cayuga* court from determining on its own the issue of whether the United States ratified the treaties. *Id.* at 948. However, prior to deciding the issues on its own, the *Cayuga* court ordered the development of a full factual record regarding the circumstances of the conveyances and stated that the findings of the ICC might indeed have relevance to future issues in the action before it. *But see Seneca Nation of Indians v. State of New York*, 26 F.Supp.2d 555, 569–70 (W.D.N.Y. 1998) (noting that the United States cannot be barred from re-litigating previously litigated issues in a case of nonmutual collateral estoppel and finding that where plaintiffs' claims are identical to those of the United States, it makes no difference whether the plaintiffs are barred from re-litigating the issue). The situation before this Court is similar to that before the *Cayuga* court.

■ It is not appropriate at this time to strike Defendants' defense of collateral estoppel, since further development of the factual and legal record may reveal issues to which the prior determinations of the ICC and the Court of Claims may prove relevant. If such instances do arise, the defense of collateral estoppel will of course be limited to issues actually litigated and decided in those prior actions, and will apply only to issues that were necessary to the outcome of those actions.

### G. *Laches and Adverse Possession* [19]

■ Courts analyzing Indian land claim actions have consistently rejected the use of delay-based defenses. *See Oneida Indian Nation of New York v. State of New York*, 691 F.2d 1070, 1084, 1097 (2d Cir.1982) (rejecting the validity of delay-based defenses, specifically laches, in Indian land claim action); *Oneida Test Case—Circuit*, 719 F.2d 525, 538 (2d Cir. 1983) (recognizing that "we have recently rejected that [Indian land claim] actions are time barred"); *Oneida Indian Nation of New York v. State of New York*, 860 F.2d 1145, 1149 (2d Cir.1988) (recognizing its previous rejection of laches and other delay-based defenses in Indian land claim actions); *Oneida II*, 470 U.S. at 262 n. 10, 105 S.Ct. 1245 (Stevens, J., dissenting) ("The Court of Appeals' rejection of delay-based defenses, 719 F.2d 525, 538 (2d Cir. 1983), will remain the law of the Circuit until it is reversed by this Court, and will no doubt apply to the numerous Indian claims pending in the lower courts."); *Seneca Nation of Indians v. State of New York*, 93–CV–688A, 1994 WL 688262, at *2 (W.D.N.Y. Oct.28, 1994) ("The Second Circuit has definitively ruled that delay-based defenses founded on both state law and federal law are inapplicable to claims un-

---

18. Counties' defenses 10 and 17. State's defense 18.

19. Counties' defenses 11 and 29. State's defenses 2 and 8.

der the Nonintercourse Act."); *Seneca v. New York,* 26 F.Supp.2d 555, 573 (W.D.N.Y.1998) (following the Supreme Court's reasoning in *Oneida II* and rejecting the defense of laches). The law on this issue overwhelmingly supports striking Defendants' laches and adverse possession defenses as legally insufficient.

Defendants maintain that the Supreme Court's reasoning in *Oneida II* leaves open the question of whether the defense of laches applies to claims by Indian tribes. However, even though the Supreme Court did not definitively decide the issue, the strong language it used in contemplating a laches defense has been recognized by lower courts as effectively barring the defense of laches in Indian land claims. The Supreme Court noted that the "statutory restraint on alienation of Indian tribal land adopted by the Nonintercourse Act of 1793 is still the law" and stated that this fact suggests that the application of laches is inconsistent with established federal policy. *Oneida II,* 470 U.S. at 245 n. 16, 105 S.Ct. 1245. The reasoning of the Supreme Court has been adopted by lower courts in determining whether laches is an available defense in Indian land claim actions. In *Oneida Indian Nation of New York v. City of Sherrill,* 145 F.Supp.2d 226, 259 (N.D.N.Y.2001), the court denied defendant's motion to amend its answer to add a defense of laches. Laches, the court stated, "is not an available defense in actions brought by Indians ... to protect their rights to their land." *Id.* (basing its determination in part on the "federal statutory protection against the alienation of Indian land without Congressional action"). Judge Port also found that the doctrines of laches and adverse possession could not validate the land transaction at issue in the test case. *See Oneida Test Case,* 434 F.Supp. at 542 ("Adverse possession and laches are no defense to a suit by the

government to protect restricted land."); *see also Oneida Indian Nation of New York v. State of New York,* 691 F.2d 1070, 1083 (2d Cir.1982) ("Defenses [in Indian land claim cases] based upon state adverse possession laws and state statutes of limitations have been consistently rejected.").

In light of the extensive law rejecting the laches and adverse possession defenses in Indian land claims, the Court finds that Defendants' defenses of laches and adverse possession are insufficient as a matter of law.

### H. *Failure to Exhaust Remedies and Election of Remedies* [20]

Defendants argue that Plaintiffs have failed to exhaust the remedies available to them. Defendants base this contention on the decision of Plaintiffs to withdraw claims similar to those in this action that they brought before the ICC. Plaintiffs withdrew their claims from the ICC after a favorable finding of liability but prior to a determination of damages.

A failure to exhaust remedies defense is generally asserted in a case where a plaintiff has failed to pursue administrative or state remedies available to it. The doctrine of failure to exhaust remedies provides that a plaintiff is not entitled to judicial relief for an alleged injury until the prescribed administrative remedy has been exhausted. *See McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Exhaustion of remedies "is based on the need to allow agencies to develop the facts [and] to apply the law in which they are peculiarly expert." *Schlesinger v. Councilman,* 420 U.S. 738, 756, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975).

■■■ Plaintiffs argue that their decision to pursue remedies before the ICC and the Court of Claims should not preclude them

---

**20.** Counties' defense 14. State's defenses 19– 20.

from pursuing this action. This argument is based in part on Plaintiffs' contention that ICC proceedings do not bar remedies against anyone but the federal government. *See Oneida Test Case,* 434 F.Supp. at 531 n. 9 (finding that the establishment of the ICC evidences "no intent to supplant Indian claims against other parties, governmental or private"). However, the Second Circuit has found that even in cases where an administrative court was established without exclusive or mandatory jurisdiction over the claims before it, a plaintiff who pursued remedies both in that forum and in federal court could be subject to an exhaustion defense. *See Miss America Org. v. Mattel, Inc.,* 945 F.2d 536, 541 (2d Cir.1991) (recognizing that a failure to exhaust defense has been applied by the Supreme Court where the federal courts had concurrent jurisdiction over the issue under collateral attack with an executive agency). Because there is an outstanding issue of law as to whether Defendants are entitled to an exhaustion defense, the Court will not strike it.

 Defendants also assert a defense of election of remedies, presumably also arising out of Plaintiffs' decision to file claims against the United States with the ICC. An election of remedies defense is an equitable doctrine that protects a party from being forced to respond to charges in two different fora. *See Flynn v. Goldman Sachs & Co.,* 91 Civ. 0035, 1993 WL 336957, at *2 (S.D.N.Y. Sept. 2, 1993). The Court does not see how this defense applies to Defendants. Defendants were not parties to the ICC action and are responding to Plaintiff's charges in federal court only. Therefore, the defense of election of remedies is stricken with leave to replead.

### I. *Claim Splitting* [21]

 The Defendant Counties argue that by initiating the test case in 1970, and then initiating this action in 1974, Plaintiffs are guilty of claim splitting. Plaintiffs argue that a claim splitting defense does not apply where the parties have acquiesced to the claim splitting. There are unresolved issues of fact as to whether the Counties acquiesced to the splitting of Plaintiffs' claims between this case and the test case. A determination of whether or not counties acquiesced in the Plaintiffs' claim splitting requires a factual determination that is not appropriate for the Court to make on a motion to strike. The Counties' defense of claim splitting therefore remains.

### J. *Res Judicata* [22]

 Under the doctrine of res judicata "a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Res judicata applies to any claim or defense previously available, whether or not it was actually litigated or determined. *See Tucker v. Arthur Andersen & Co.,* 646 F.2d 721, 727 (2d Cir.1981). The main concern underlying the doctrine of res judicata is to bring litigation to an end after the parties have had a fair opportunity to litigate their claims. *See Seneca Nation of Indians v. State of New York,* 26 F.Supp.2d 555, 566 (W.D.N.Y.1998).

It is somewhat unclear to which prior actions Defendants claim res judicata applies. In Defendants' brief, the defense of res judicata is connected to their defense of claim splitting, thus leading the Court to believe that Defendants assert a res judi-

---

**21.** Counties' defense 15.

**22.** Counties' defense 16. State's defense 17.

cata defense as to issues resolved in the test case.

■ There are unresolved issues of fact as to what claims may have been resolved in the test case and would therefore be barred by res judicata in this action. There is also a substantial outstanding issue of law as to whether the State is in privity to the defendants in the test case such that res judicata would apply. *See Seneca v. New York*, 26 F.Supp.2d 555, 567 (W.D.N.Y.1998) (outlining privity concerns). Defendants' res judicata defense therefore survives.[23]

### K. *Judicial Estoppel*[24]

■ "The doctrine of judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding." *Bates v. Long Island R.R.*, 997 F.2d 1028, 1037 (2d Cir.1993). The elements are (1) the party against whom judicial estoppel is asserted must have argued an inconsistent position in a prior proceeding, and (2) the prior inconsistent position must have been adopted by the court in some manner. *See id.* at 1038.

Defendants have not set forth any specific reasoning behind this defense, nor have Plaintiffs come forward with any reason why this defense is invalid other than to allege that it is conclusory. In the absence of any argument on the merits of this defense, the Court finds that it is factually and legally possible that Defendants will be able to use this defense in this action. It will therefore not be stricken.

### L. *Accord and Satisfaction, Unclean Hands and Waiver*[25]

■ All three of these defenses are based on a presumption that Plaintiffs' behavior following a land transaction can validate the transaction even in the absence of federal approval. In *Oneida I* the Supreme Court interpreted the Nonintercourse Act to require federal approval of Indian land transactions in order to validate them. *See Oneida I*, 414 U.S. at 678, 94 S.Ct. 772 (stating that the Oneida Plaintiffs' land claims arise from "treaties guaranteeing their possessory rights until terminated by the United States"); *see also Oneida II*, 470 U.S. at 244, 105 S.Ct. 1245. In light of the Supreme Court's interpretation of the Nonintercourse Act, the Court finds that "the application of state law-based defenses of accord and satisfaction and unclean hands would contravene established policy pertaining to Indian's ability to enforce their property rights." *Seneca v. New York*, 93–CV–688A, 1994 WL 688262, at *1 (W.D.N.Y. Oct.28, 1994). Allowing these types of defenses in an Indian land claim action would contradict federal policy regarding the requirements under the Nonintercourse Act for the validation of Indian land transactions. *See Oneida I*, 414 U.S. at 670, 94 S.Ct. 772 (finding that Indian title to land can be extinguished only with federal consent); 470 U.S. at 247–48, 105 S.Ct. 1245 (finding that federal intent to extinguish tribal possessory rights to land must be plain and unambiguous).

**23.** The Court notes, however, that if res judicata is found to apply to the test case, it will be applied to any issue fully and fairly litigated and determined in that action, and the State will therefore be bound by decisions in the test case even if those decisions are adverse to it. The Court makes this point because the State takes pains in its brief to point out its status as a non-party to the test case, implying that the determinations in that action cannot bind it.

**24.** Counties' defense 18.

**25.** Counties' defenses 19, 21 and 22. State's defenses 11–12 and 14.

### M. *Abandonment and Release and Relinquishment* [26]

The Defendant Counties claim specifically that the Wisconsin Oneida and the Thames Oneida abandoned their land and that all three Plaintiffs are subject to a defense of release and relinquishment. The State alleges that all three Plaintiffs are subject to a defense of release, relinquishment, and abandonment.

By asserting these defenses, Defendants are contending that by moving away from their New York lands, Plaintiffs gave up any rights they may have had in those lands. Defendants find some support for the availability of these defenses in *Cayuga Indian Nation of New York v. Cuomo*, 758 F.Supp. 107 (N.D.N.Y.1991), which discusses the availability of an abandonment defense in an Indian land claim action. The *Cayuga* court determined that the viability of the abandonment defense hinged on the type of title to the land held by the Indian plaintiffs. *Id.* at 110. The court concluded that there are two types of title, aboriginal title and fee title, and that while fee title cannot be abandoned, aboriginal title can. *Id.* Plaintiffs admit that aboriginal title may be abandoned, but contend that Indians may not abandon land given to them in a treaty with the United States by entering into an unlawful land transaction with the State.

■■■ The question that must be resolved in order to determine the validity of Defendants' defense is whether the Oneida Nation possessed aboriginal rights over the land at issue or whether it possessed actual fee title to the land. This issue requires further discovery and a thorough statutory and treaty interpretation. The Court is unwilling at this point to rely on the legal and factual determinations of the test case and other Indian cases when this action presents unresolved issues of fact dealing with entirely different land transactions and requires an interpretation of the relevant treaties as they apply to the Oneida Nation specifically. *See Oneida Test Case*, 434 F.Supp. at 541 (stating that the Oneidas had never abandoned their claim to their ancestral homeland but not defining the term abandonment or interpreting any statute or treaty in that regard); *see also United States v. Boylan*, 265 F. 165, 167–68 (1920) (holding that Oneidas possessed a New York reservation of land, but not determining what that meant for an abandonment defense). Defendants' abandonment, release and relinquishment defenses therefore remain.

### N. *Statute of Limitations* [27]

Defendants assert statute of limitations as an affirmative defense both generally, and, in the case of the Counties, specifically as to the Oneida of the Thames.

■■■ Courts in Indian land claim cases have consistently held that no statute of limitations defense is available to defendants in these actions. In the test case, the Supreme Court rejected the Counties' statute of limitations defense, noting that there is no federal statute of limitations in Indian land claim cases, and stating that "the borrowing of a state limitations period in these cases would be inconsistent with federal policy." *Oneida II*, 470 U.S. at 241, 105 S.Ct. 1245; *see also Seneca Nation of Indians v. State of New York*, 93–CV–688A, 1994 WL 688262, at *1 (W.D.N.Y. Oct.28, 1994) (citing *Oneida II* and striking defendants' statute of limitations defense in Indian land claim action); *Oneida Indian Nation of New York v. City of Sherrill*, 145 F.Supp.2d 226, 260 (N.D.N.Y.2001) (citing *Oneida II* and re-

---

**26.** Counties' defenses 24–26. State's defenses 6–7.

**27.** Counties' defenses 27–28. State's defense 15.

fusing defendants' motion to amend their answer to include a statute of limitations defense in Indian land claim case); *Oneida Indian Nation of New York v. State of New York*, 691 F.2d at 1083 ("Defenses [in Indian claim cases] based upon … state statutes of limitations have been consistently rejected."). The Supreme Court supported its finding by discussing 28 U.S.C. § 2415, which defines timeliness for suits brought by the United States on behalf of tribes for which it is a trustee.[28] *See Oneida II*, 470 U.S. at 241, 105 S.Ct. 1245; *see also Oneida v. New York*, 691 F.2d at 1083. The Supreme Court noted that 28 U.S.C. § 2415 reaffirmed the general federal policy that there is no statute of limitations applicable to Indian land claims. The Supreme Court then went on to discuss legislative history, unrelated to the United States' trust relationship with Indian tribes, that further supports this general policy. In finding that the statute of limitations defense was unavailable to the test case defendants, the Supreme Court concluded decisively that "Indian land claims [are] exclusively a matter of federal law" and that "there is a congressional policy against the application of state statutes of limitations in the context of Indian land claims." *Oneida II*, 470 U.S. at 241, 105 S.Ct. 1245.

Defendants attempt to distinguish the Supreme Court's ruling in the test case from this action. They argue that this case involves more land transactions and involves at least one plaintiff (the Oneida of the Thames) that *does* not have a trust relationship with the United States. Defendants argue that because the Supreme Court based its reasoning partly on federal

policy implemented by its trust relationship with Indian tribes, its ruling does not apply to Indian tribes, such as the Thames Oneida, that lack this relationship. The Court does not find these differences compelling. The Thames Oneida was also a plaintiff in the test case, and the Supreme Court surely would have specified that its ruling was inapplicable to the Thames Oneida if that were the case. The Supreme Court's ruling is sufficiently broad to cover the circumstances present in this action. The Supreme Court was not analyzing the statute of limitations defense only in the context of the one particular land transaction at issue in that case. Instead, its language is worded broadly, to apply to all land claims brought by or on behalf of Indian tribes. The ruling of the Supreme Court regarding congressional policy governing statute of limitations defenses in Indian land claims is clear and directly applicable here. Defendants' statute of limitations defense is therefore stricken.

### O. *Indispensable Parties* [29]

The Court has addressed the Defendants' motion to dismiss in which they claim that there are absent parties who are necessary and indispensable to this action. Since the Court has determined that none of the parties named by the Defendants are in fact necessary to this action, the Defendants' affirmative defenses dealing with indispensable parties are stricken.

### P. *Abatement* [30]

■ Defendant New York State argues that since the Nonintercourse Act of 1793

---

28. Subsections a and b of 28 U.S.C. § 2415 provide that actions for the recovery of tort or monetary damages that accrued prior to the statute's enactment on July 18, 1966 are timely if filed prior to December 31, 1982. Subsection c states that there is no statute of limitations for the establishment of title to or rights to possession of property.

29. Counties' defenses 30–33. State's defenses 35–38.

30. State's defense 16.

was replaced by subsequent acts, the new statutes replaced the old and any cause of action under the old statute abated on its expiration date. In *Oneida II* the Supreme Court rejected this interpretation of the Nonintercourse Act, finding that in the subsequent revised acts, the pertinent provisions of the Act remained in force, containing "substantially the same restraint on Indian lands." *Oneida II,* 470 U.S. at 245–46, 105 S.Ct. 1245 (citing *Bear Lake and River Waterworks and Irrigation Co. v. Garland,* 164 U.S. 1, 11–12, 17 S.Ct. 7, 41 L.Ed. 327 (1896) (finding that where similar provisions of an act have remained in force, a new act is considered to be a continuation of the old)). In *Oneida I* the Supreme Court performed a similar analyses of the Nonintercourse Act, concluding that it "put in statutory form what was or came to be the accepted rule—that the extinguishment of Indian title required the consent of the United States." *Oneida I,* 414 U.S. at 678, 94 S.Ct. 772. In summary, the Supreme Court in *Oneida II* stated, "the precedents of this Court compel the conclusion that the Oneida's cause of action has not abated." *Oneida II,* 470 U.S. at 246, 105 S.Ct. 1245. There is no reason that the Supreme Court's interpretations of the Nonintercourse Act in *Oneida I* and *Oneida II* do not apply to this action. Defendants' abatement defense is therefore stricken.

## Q. *Eleventh Amendment* [31]

 When litigation is brought by or could have been brought by the United States on behalf of an Indian Nation and the claims made by the United States are identical to those made by the Indian tribe, the Eleventh Amendment has been found not to apply. *See, e.g., Oneida Nation of New York v. State of New York,* 691 F.2d 1070, 1080 (2d Cir.1982) (finding that where the United States could have sued, "raising the same claims asserted by the Oneida Nation," Eleventh Amendment immunity does not apply); *see also Seneca Nation of Indians v. State of New York,* 26 F.Supp.2d 555, 564 (W.D.N.Y.1998) (same, and stating that "the Senecas' and the United States' claims are virtually identical"). However, it is also a well established rule of law that the State should retain its immunity to the extent that the Plaintiffs raise any claims that conflict with those of the United States. *See Seneca Nation of Indians v. State of New York,* 178 F.3d 95, 97 (2d Cir.1999) (affirming defendants' Eleventh Amendment immunity defense but noting that New York retains immunity to the extent that the Plaintiffs raise any claims or issues not identical to those made by the United States). In this action it appears that Plaintiffs may potentially have claims that conflict with those of the United States. It is too early in the proceeding to disregard the possible immunity of the State on issues in which there may be conflict. The State's Eleventh Amendment immunity defense therefore remains to the extent that Plaintiffs' claims conflict with those of the United States.

## R. *Lost Title Presumption* [32]

 The defense of lost title allows a defendant to substitute presumptions about title to land for formal instruments or records. The defense "recognizes that lapse of time may cure the neglect or failure to secure the proper muniments of title." *United States v. Fullard–Leo,* 331 U.S. 256, 270, 67 S.Ct. 1287, 91 L.Ed. 1474 (1947). A presumption of lost title defense is based largely on the same principles that underlie the defense of adverse possession, that a land grant "will be pre-

---

**31.** State's defenses 22–23.

**32.** State's defense 9.

sumed upon proof of an adverse, exclusive, and uninterrupted possession for 20 years." *Id.* at 271, 67 S.Ct. 1287 (citation omitted). The defense of adverse possession is not available to Defendants in this action for the reasons stated above. *See* discussion *supra* p. 123, Part II.G. These principles apply equally to a presumption of lost title as they do to the defense of adverse possession. For this reason, Defendants' presumption of lost title defense is stricken.

### S. *Lack of Notice* [33]

■ The State contends that Plaintiffs' claims are barred or mitigated by Plaintiffs' failure to notify the State of any potential liability as a result of the land transactions at issue. Plaintiffs attack this defense as arising under state law and therefore inappropriate as a defense to an Indian land claim action.[34] The Court can find no precedent for this type of defense under federal law. Furthermore, the Court agrees with Plaintiffs that such a defense under state law is unavailable to Defendants in light of the Supreme Court rulings in *Oneida I* and *Oneida II*. The Court orders this defense stricken with leave to replead if Defendants are able to present some scenario under federal law through which this defense could succeed.

### T. *Failure to State a Claim* [35]

■ It is well settled that a failure to state a claim defense is an appropriate affirmative defense. *See, e.g., County Vanlines, Inc. v. Experian Info. Solutions, Inc.,* 205 F.R.D. 148, 153 (S.D.N.Y.2002).

There are several outstanding issues of law and fact in this action that preclude an early finding that Defendants' failure to state a claim defense is unavailable to them. In addition, unlike the other defenses asserted by Defendants, there is no prejudice presented by this defense. Therefore, the defense remains.

## BROTHERTOWN'S MOTION TO STRIKE DEFENDANTS' AFFIRMATIVE DEFENSES

### I. *Overlap with Plaintiffs' Motion to Strike*

The Court has addressed most of the issues raised in Brothertown's motion to strike in its decision on Plaintiffs' motion to strike. Many of the defenses asserted by the Defendants against Brothertown are identical to those asserted by Defendants against Plaintiffs. Except for the issues unique to Brothertown, addressed below, Brothertown is bound by the Court's ruling on Plaintiffs' motion.[36] In this section, the Court will discuss those issues unique to Brothertown's motion or specifically raised by Defendants in their opposition papers to Brothertown's motion. The legal standard to be applied to Brothertown's motion is identical to the standard applicable to Plaintiffs' motion.

### II. *Brothertown's Defenses*

#### A. *Statute of Limitations* [37]

Defendants argue that their statute of limitations defense should survive as to Brothertown's claims specifically because

---

**33.** State's defense 32.

**34.** There are several notice of claim requirements arising in various state court contexts in New York. *See* David D. Siegel, *New York Practice* § 32 (1999).

**35.** State's defense 1.

**36.** The defenses asserted against Brothertown that have already been resolved by the Court in its decision on Plaintiffs' motion to strike are State Defenses 1–14, 16, 19, 24, and 27–32 and Counties Defenses 1, 3–7, 9, 12–19, and 22–25.

**37.** State Defense 15 and Counties Defenses 20–21.

Brothertown is not a federally recognized tribe. In their opposition papers, Defendants repeat their argument, *see* discussion *supra* p. 127, Part II.N, that the Supreme Court's rejection of a statute of limitations defense based on a state statute of limitations in *Oneida II* does not apply to Indian tribes that are not federally recognized. The Court has rejected this interpretation of *Oneida II*. The Supreme Court's ruling in *Oneida II* regarding the use of a state statute of limitations defense in an Indian land claim action was worded broadly and applies to all land claims brought on behalf of Indian tribes, not just federally recognized tribes. *See Oneida II*, 470 U.S. at 240–44, 105 S.Ct. 1245.

 Defendants also argue that the federal statute of limitations mandated by 28 U.S.C. § 2415(b) should apply to Brothertown's claim. Defendants contend that since Brothertown's claim is not specifically included in a list of actions exempt from this statute of limitations and since Brothertown did not bring its claims within six years and ninety days after the right of action accrued, Brothertown's claims are time barred. This argument is without merit. The "Oneida Nonintercourse Act Land Claim" is specifically excluded from this statute of limitations. *See* 48 Fed. Reg. 13920. Brothertown is a party to this action as an intervenor. It bases its claims on land that was already part of the Oneidas' land claim and relies on the same laws and treaties as the Oneidas to support its requests for relief. Defendants' federal statute of limitations defense could be viable in a situation where Brothertown initiated its own separate action against Defendants, or even where Brothertown asserted claims to land that was not already included in the Oneidas' land claim. However, under the circumstances of this action, Brothertown's claims are not sub-ject to the statute of limitations in 28 U.S.C. § 2415(b).

**B.** *Res Judicata, Collateral Estoppel and Failure to Exhaust* [38]

 In support of its argument to strike these defenses, Brothertown states in conclusory fashion that it has not been a party to any other action in which it has asserted the claims it asserts in this action and that no final judgment has been entered in any case involving the land transactions challenged by Brothertown in this action. In response, Defendants claim that striking these defenses would be premature. They argue specifically that under res judicata and failure to exhaust, Brothertown could be found to be in privity with the Plaintiffs, and thus subject to decisions issued in Plaintiffs' prior, related actions. The Court agrees that striking these defenses at this time would be premature.

**C.** *Eleventh Amendment* [39]

The State specifically argues that its Eleventh Amendment immunity defense should survive as to Brothertown's claims because Brothertown is not a federally recognized tribe and the United States has not stated that it specifically represents the interests of Brothertown in this action. The State has cited no law to support this proposition, and has set forth no authority that would justify distinguishing Brothertown's situation from that of Plaintiffs. *See* discussion *supra* p. 129, Part II.Q. Whether or not the United States specifically states that it is representing the interests of Brothertown in this litigation, the United States is clearly suing to enforce federal law on which Brothertown relies. To the extent that the United States' claims are the same as Brother-

---

**38.** State Defenses 17–18, 20 and Counties Defenses 10–11.

**39.** State Defenses 21–22.

town's claims, the State is not immune. *See, e.g., Oneida Nation of New York v. State of New York,* 691 F.2d 1070, 1080 (2d Cir.1982) (finding that where the United States could have sued, "raising the same claims asserted by the Oneida Nation," Eleventh Amendment immunity does not apply). However, to the extent that Brothertown's claims diverge from those of the United States, the State's Eleventh Amendment immunity defense survives.

#### D. *Standing* [40]

██ Significant questions of fact exist as to whether Brothertown has standing to sue as an Indian tribe under the Nonintercourse Act. Unlike Plaintiffs, Brothertown is not a federally recognized tribe, nor has it been party to a lawsuit asserting the same land claims as this action in which its standing was asserted, inquired into, and accepted by the court. Brothertown argues that it has been recognized by the United States through treaties and agreements for many years, and that its lack of formal BIA recognition does not mean that it is not a "tribe" for the purpose of suing under the Nonintercourse Act. While Brothertown is correct that BIA recognition is not the only factor that determines tribal status at this point in time the Court need not reach the question of whether Brothertown actually has standing to bring a Nonintercourse Act claim. Instead, on a motion to strike, the Court must determine whether Brothertown would succeed "despite any state of the facts which could be proved in support of the defense." *Salcer v. Envicon Equities Corp.,* 744 F.2d 935, 939 (2d Cir.1984). The evidence presented by Brothertown in its moving papers is not so overwhelming as to warrant dismissing Defendants' standing defense as a matter of law. Many factual questions regarding Brothertown's standing remain.

The Court's conclusion is similar to that reached by Judge McCurn in *Canadian St. Regis Band of Mohawk Indians v. New York,* 146 F.Supp.2d 170 (N.D.N.Y.2001). In *Canadian St. Regis,* Judge McCurn found that plaintiffs had met their minimum constitutional standing requirements by asserting (1) their own legal rights, (2) a particularized grievance and a redressable injury, and (3) a claim falling within the zone of interests that the statute aims to protect. *See Canadian St. Regis,* 146 F.Supp.2d at 183–84. Likewise, Brothertown seems to have met this initial burden. However, the standing inquiry does not end here. Judge McCurn noted that if the plaintiffs' standing was challenged by the defendants at a later date, the plaintiffs "will need to produce specific facts to support [their] general allegations." *Id.* at 184. As this Court noted in its ruling on Brothertown's intervention motion, Brothertown may also be subject at some point in this litigation to a specific factual inquiry as to its standing. *See Oneida Indian Nation of New York v. New York,* 201 F.R.D. 64, 68 & n. 9 (N.D.N.Y.2001). Whether Brothertown has standing to bring a claim under the Nonintercourse Act is a fact-intensive inquiry whose resolution is not appropriate on a motion to strike. *See Canadian St. Regis,* 146 F.Supp.2d at 184. Defendants' standing defense as to Brothertown therefore remains.

#### E. *Damages Defenses* [41]

Defendants raise a few defenses that request a set-off of any damages that might be awarded to Brothertown as a result of this action. These defenses have no effect on Defendants' liability, and they will not be stricken at this time because

---

**40.** State Defense 23 and Counties Defense 2.

**41.** State Defenses 25–26 and Counties Defense 8.

they are relevant to a calculation of damages.

### UNITED STATES' MOTION TO STRIKE DEFENDANTS' AFFIRMATIVE DEFENSE

#### I. Motion for Leave to File and Motion to Stay Discovery

The United States has filed a motion for an order allowing it to file a motion to strike Defendants' standing defense. The United States failed to comply with Magistrate Judge Homer's schedule, which mandated that the United States would be required to serve any motions in response to the Defendants' answers (including any motions to strike) by May 18, 2001. A request by the United States for an extension of time to respond to the pleadings was denied by Judge Homer on May 16, 2001. A request to this Court for an extension of time to respond to the pleadings was denied on May 18, 2001. On June 18, 2001, the United States finally served the instant motion to strike Defendants' standing defense.

The United States asserts that the Court may consider its motion even though it was submitted late. In support of this argument, the United States notes that Rule 12(f) provides that the Court may "at any time, [ ] strike any redundant, immaterial, impertinent or scandalous references" in an answer. *See Wine Mkts. Int'l, Inc. v. Bass*, 177 F.R.D. 128, 133 (E.D.N.Y. 1998) (finding that granting the court this discretion renders the time limit in Rule 12(f) "essentially unimportant").

Ordinarily the Court would not look favorably on the United States' attempt to circumvent the established schedule and orders of the Court. However, in this case the Court has already ruled on most of the substantial issues raised in the United States' motion to strike since many of the same issues were raised in Plaintiffs' motion to strike. For this reason, and in accordance with the Court's discretion to do away with redundant and immaterial information contained in the pleadings, the Court grants the United States' motion for leave to serve its motion to strike Defendants' standing defense.

The United States also moves for a stay of discovery pending the outcome of this motion. A stay of discovery in this action pending the determination of the parties' outstanding motions concerning standing was granted by Magistrate Judge Homer on July 2, 2001. The United States' request for a stay of discovery is therefore denied as moot.

#### II. Standing

The United States bases its motion to strike on two grounds. First, the United States claims that it has independent standing to sue under the Nonintercourse Act in order to enforce federal laws designed to protect Indian lands. Second, the United States argues that there is no question that the Oneida Plaintiffs have standing to bring this action. Since the United States represents their interests, it also has standing.

Defendants do not deny the United States' second premise. The Defendants argue, however, that the United States' standing to sue on behalf of Indian tribes is dependant on a finding that the Oneida Plaintiffs have standing. Neither party disputes that if the Oneida plaintiffs have standing in this action, the United States also has standing. *See* Def.'s Memo of Law at 12 ("The United States can only represent the interests of the historic Oneida Nation to enforce the [Nonintercourse Act] where the Tribes themselves have standing to sue.").

This Court has found that Plaintiffs have standing to bring this claim as a matter of law. Therefore, the Court need not resolve the issue of whether the Unit-

ed States has independent standing to bring a claim in this action. Because Plaintiffs have standing, there is a tribal claim on the land at issue in this action, and the United States has standing to intervene as a fiduciary on behalf of the Plaintiff tribes. *See, e.g., Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 379 (1st Cir.1975) ("That the Nonintercourse Act imposes upon the federal government a fiduciary's role with respect to protection of the lands of a tribe covered by the Act seems to us beyond question .... The purpose of the Act has been held to acknowledge and guarantee the Indian tribes' right of occupancy, and clearly there can be no meaningful guarantee without a corresponding federal duty to investigate and take such action as may be warranted in the circumstances.") (citations omitted). The United States has standing to intervene in this action as a matter of law. The Defendants' standing defense is therefore stricken.

## PLAINTIFFS' AND THE UNITED STATES' MOTIONS TO DISMISS DEFENDANTS' COUNTERCLAIMS

Defendants assert one counterclaim against Plaintiffs and five counterclaims against the United States.

### I. *Standard*

 Plaintiffs and the United States move to dismiss Defendants' counterclaims pursuant to Fed.R.Civ.P. 12(f). A court's duty when examining a motion to dismiss a counterclaim pursuant to Rule 12(f) is "merely to determine whether the pleading itself is legally sufficient," not to weigh all of the evidence that may be presented at trial. *Song v. Dreamtouch, Inc.,* No. 01 Civ. 0386, 2001 WL 487413, at *1 (S.D.N.Y. May 8, 2001). A motion to dismiss a counterclaim is analyzed in the same manner as a motion to dismiss.

Plaintiffs and the United States argue that Defendants' counterclaims fail for lack of subject matter jurisdiction under Rule 12(b)(1) and fail to state a claim under Rule 12(b)(6). Under Rule 12(b)(6) a claim must be denied "unless it appears beyond doubt that the [claimant] can prove no set of facts in support of his claim [that] would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In assessing the sufficiency of a pleading, "all factual allegations in the [pleading] must be taken as true," *La-Bounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991), and all reasonable inferences must be construed in favor of the claimant. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1098 (2d Cir.1988). The Rules do not require the claimant to set out in detail the facts upon which the claim is based, but only that the party against whom the claim is asserted be given "fair notice of what the claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

 In considering a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), a court must accept as true all material factual allegations in the complaint and refrain from drawing inferences in favor of the party contesting jurisdiction. *See Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992). However, the court may consider evidence outside the pleadings, such as affidavits, documents and testimony. *See Dajour B. v. City of New York,* 00 Civ.2044, 2001 WL 830674, at *2 (S.D.N.Y. July 23, 2001). The standard is therefore similar to a motion for summary judgment. *See id.* Defendants must show by a preponderance of the evidence that subject matter jurisdiction over their claims exists. *See Makarova v.*

*United States,* 201 F.3d 110, 113 (2d Cir. 2000).

It is with these standards in mind that the Court addresses the issues presented.

## II. *Discussion*

### A. *Disestablishment*

Defendants assert a disestablishment counterclaim against both Plaintiffs and the United States. Defendants request a declaration by the Court that any reservation of land claimed by the Oneidas has been disestablished and is no longer in existence. Defendants base this counterclaim on their own interpretation of the treaties at issue in this action. Defendants first contend that in the 1788 Treaty of Fort Schuyler Plaintiffs ceded all of their land to the State of New York. While Defendants concede that some land was set aside for the Oneidas in the Ft. Schuyler Treaty, they contend that the Oneidas' right to this land was only possessory and that title was actually ceded to New York State. Second, Defendants argue that the 1794 Treaty of Canandaigua recognized only the Oneidas' right to possess the land that was set aside in 1788. Finally, Defendants contend that the Oneida's loss of their land was made final in the 1838 Treaty of Buffalo Creek, which gave the Oneidas land in Kansas. Defendants assert that the Treaty of Buffalo Creek is premised on the condition that those Oneidas remaining in New York leave New York and move to Kansas. In addition, under the Treaty of Buffalo Creek, the Oneidas who had moved to the land given to them in Wisconsin were to leave that land and move to Kansas. As a result of these transactions, the Defendants argue, none of the land at issue in this action belongs to the Oneidas or should be under federal jurisdiction as Indian land. Instead, it is New York State land and has been recognized as such for hundreds of years.

#### 1. *Immunity*

Plaintiffs and the United States challenge this Court's subject matter jurisdiction over Defendants' disestablishment counterclaim they claim that they are immune from suit on this issue, and there has been no waiver of their immunity. That the United States and Indian tribes possess sovereign immunity from suit is a well-accepted principle of law. *See Federal Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *Kiowa Tribe v. Manufacturing Tech.,* 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998) ("As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity."). However, both the United States and Indian tribes may waive their immunity. Defendants argue that Plaintiffs and the United States have in fact waived their immunity to a disestablishment counterclaim by bringing this action against Defendants.[42]

 According to the doctrine of sovereign immunity, the United States may not be sued absent "specific statutory consent." *United States v. Shaw,* 309 U.S. 495, 500–01, 60 S.Ct. 659, 84 L.Ed. 888

---

**42.** Because the law governing tribal immunity is largely equivalent to the law governing the United States' sovereign immunity for purposes of this claim, the Court discusses the law of immunity applicable to both claims together. *See Catskill Dev., L.L.C. v. Park Place Entertainment Corp.,* 206 F.R.D. 78, 87– 88 (S.D.N.Y.2002) ("Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers, such as the United States.") (citations and internal quotations omitted).

(1940). While sovereign immunity may be waived, by statute or other means, any waiver of sovereign or tribal immunity must be unequivocally expressed. *See United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). There is no automatic waiver of immunity as to counterclaims when the United States or an Indian tribe brings a lawsuit, and thus no general right of defendants to bring counterclaims against the United States or an Indian tribe. *See Presidential Gardens Assocs. v. United States ex rel. Sec. of Hous. and Urban Dev.*, 175 F.3d 132, 140 (2d Cir.1999); *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). However, it is well established that when the United States or an Indian tribe initiates a lawsuit, a defendant may assert counterclaims that sound in recoupment even absent a statutory waiver of immunity. *See, e.g., United States v. Forma*, 42 F.3d 759, 764 (2d Cir.1994); *United States v. Tsosie*, 92 F.3d 1037, 1043 (10th Cir.1996); *Rosebud Sioux Tribe v. Val–U Constr. Co. of South Dakota*, 50 F.3d 560, 562–63 (8th Cir.1995); *Livera v. First Nat'l State Bank of New Jersey*, 879 F.2d 1186, 1195–96 (3d Cir. 1989).

 Defendants contend that their disestablishment counterclaim sounds in recoupment and that the United States and Plaintiffs have therefore waived their immunity to such a claim by bringing this action. In order for the Court to exercise subject matter jurisdiction over Defendants' counterclaim as a claim sounding in recoupment, the counterclaim must arise "out of the transaction that grounds the main action" and must request only a set-off of damages, not affirmative recovery. *Forma*, 42 F.3d at 765. The rule governing sovereign immunity in recoupment actions is that "a party sued by the United States may recoup damages ... so as to reduce or defeat the government's claim ... though no affirmative judgment ... can be rendered against the United States." *Id.* (citations omitted); *see also United States v. Frank*, 207 F.Supp. 216, 221 (S.D.N.Y.1962) (finding that "recoupment may be set up in a counterclaim against the United States without statutory authority" and allowing defendant's counterclaim to proceed because defendant claimed nothing more than the value of the goods claimed by the government and did not seek affirmative recovery). Thus, as long as Defendants' counterclaim does not "venture outside the subject of the original cause of action," the United States and the tribal Plaintiffs can be considered to have waived their immunity to such a counterclaim. *Tsosie*, 92 F.3d at 1043 (citations and internal quotations omitted).[43]

The factual situation in *Tsosie* is similar to the situation confronting this Court, and is instructive as to the circumstances under which the United States can be found to have waived its immunity to a recoupment counterclaim. In *Tsosie*, the United States brought a trespass and ejectment action against the defendant on behalf of an Indian who claimed the land at issue. *Id.* at 1039. The defendant asserted a counterclaim seeking a declaratory judgment that she had an unextinguished aboriginal right of occupancy in the land. *Id.* The *Tsosie* court rejected the United States' contention that it was immune to the defendant's counterclaim. *Id.* The court found that because defendant's coun-

---

**43.** Some courts have equated this inquiry with the inquiry governing compulsory counterclaims under Fed. Rule of Civ. Proc. 13(a). *See United States v. Isenberg*, 110 F.R.D. 387, 391 (D.Conn.1986). Defendants' disestablishment counterclaim meets the standard for a compulsory counterclaim.

terclaim asserted claims and sought relief "based on issues asserted by the United States in its complaint, sovereign immunity has been waived." *Id.* at 1043.

■ In this action, Plaintiffs have requested a determination from the Court that they have possessory rights to the lands at issue and that Defendants' interests in these lands are void. The United States has joined in that action on behalf of Plaintiffs, also asserting Plaintiffs' rights to the land at issue. Defendants in turn have counterclaimed, requesting a declaration by the Court that any rights Plaintiffs may have had in the land have been disestablished and that Plaintiffs therefore have no rights to the subject lands. Counterclaims such as this one have been held to be permissible against Indian plaintiffs. *See Rosebud Sioux Tribe v. A & P Steel, Inc.*, 874 F.2d 550, 552–53 (8th Cir.1989) (concluding that the plaintiff tribe specifically waived its immunity to a counterclaim that arose out of the same transaction and sought relief similar to, and in an amount not in excess of, the plaintiff tribe's claim); *cf. Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 508–10, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (finding that plaintiff tribe did not waive its immunity as to defendants' counterclaim for taxes because the counterclaim requested relief beyond that sought by plaintiff, who sought only injunctive relief). This counterclaim arises out of the same transactions and seeks relief similar to that sought by Plaintiffs and the United States. In addition, the relief sought by Defendants is for an amount no more than that sought by Plaintiffs and the United States. Defendants do not seek any monetary or other relief beyond a finding that the land

at issue does not belong to Plaintiffs and is not under federal jurisdiction.

For these reasons, the Court finds that Defendants' disestablishment counterclaim sounds in recoupment and that such a claim may proceed against the United States and Plaintiffs despite their claims of immunity.

### 2. *Sufficiency and Ripeness of Defendants' Claim*

Both Plaintiffs and the United States argue that there is no substantial controversy present in this action sufficient to warrant the issuance of a declaratory judgment on Defendants' counterclaim. Specifically, Plaintiffs argue that Defendants' claim is insufficient to merit a request for declaratory relief. Similarly, the United States argues that Defendants' claim is not ripe for adjudication. The standard under which both of these arguments are analyzed is the same. The Court must determine whether the facts alleged by Defendants show that there is an actual controversy of sufficient immediacy to justify a declaratory judgment.[44] *See* 28 U.S.C. § 2201(a); *Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 17 (2d Cir.1993) (stating that a declaratory judgment may issue when there is a "substantial controversy" between the parties of "sufficient immediacy and reality"); *Pedre Co. v. Robins*, 901 F.Supp. 660, 663 (S.D.N.Y.1995) (stating that "the standard for ripeness in a declaratory judgment action is 'whether ... there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment' ") (citing *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826

---

**44.** The actual controversy requirement for declaratory judgment purposes is the same as the "case and controversy" requirement of Article III, § 2 of the Constitution. *See Bath Petroleum Storage, Inc. v. Sovas*, 136 F.Supp.2d 52, 57 (N.D.N.Y.2001).

(1941)). Ultimately, the Court has discretion to accept or reject Defendants' request for declaratory judgment. *See Wilton v. Seven Falls Co.,* 515 U.S. 277, 288, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) ("By the Declaratory Judgment Act, Congress ... created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants.").

■ Defendants assert that a real controversy as to the disestablishment of any Oneida reservation exists because members of the Oneida Nation have purchased parts of the land in dispute in this action. Upon purchasing the land, the Indian owners have refused to accept the sovereignty of the State of New York over the land, refuse to pay taxes, and refuse to comply with state and local ordinances on the land. A case involving these issues is currently pending in this district under the caption *Oneida Indian Nation of New York v. City of Sherrill.* According to Defendants, the controversy over the land bought by the Oneidas constitutes a present controversy in this action.· The Court agrees.

This case brings into question the status of the land disputed in this action. There is a fundamental controversy between the parties as to whether the subject land was unlawfully purchased from the Oneidas by the State, and is therefore Indian land properly subject to federal jurisdiction, or whether the land was properly purchased by the State and therefore subject to State and local laws and regulations. The uncertainty as to these issues has significant real effects on the State, the counties affected, and the landowners in these areas.[45]

Plaintiffs do not dispute that the above controversy exists. Instead, they argue that this type of controversy is best resolved in the *Sherrill* action currently pending before Judge Hurd. They therefore urge the Court to use its discretion and dismiss Defendants' counterclaim for declaratory judgment in this action. In support of this argument, Plaintiffs cite *Fusco v. Rome Cable Corp.,* 859 F.Supp. 624 (N.D.N.Y.1994), which states that the purpose of a declaratory judgment action is to decide rights not already determined, and not to determine whether previously determined rights were adjudicated properly. *Fusco,* 859 F.Supp. at 629. However, Plaintiffs fail to acknowledge that the *Sherrill* action concerns only a portion of the land at issue in this action. A declaration on behalf of the defendants in this action would provide a measure of security with regard to the entire parcel of land claimed by the Oneidas and would prevent wasteful and duplicatory piecemeal litigation regarding the status of the land.

The United States argues that the Court should not allow Defendants' counterclaim to proceed because "reservation" is a complex term and the United States has not definitively determined how the disputed land would be categorized should Plaintiffs prevail in this action. The Court does not believe that this argument warrants a dismissal of Defendants' claim.

It is difficult for the Court to accept the United States' argument when its Amended Complaint, and that of the Plaintiffs, so clearly put at issue the jurisdictional status of the disputed land. Plaintiffs and the United States specifically request that the Court declare any and all interests of Defendants in the land null and void. *See* Pls. Am. Compl., Prayer for Relief ¶ 1(e);

**45.** The Court notes that several actions have been filed recently by the Wisconsin Oneida seeking ejectment against private landowners in the disputed area. *See, e.g., The Oneida Tribe of Indians of Wisconsin v. Barretta Brothers LLC,* 02–CV–00236. The existence of these actions further supports Defendants' argument that there is a real and immediate conflict as to the status of the disputed lands.

U.S. Am. Compl., Prayer for Relief ¶ 2. This request in the Amended Complaints of Plaintiffs and the United States can only be understood as a request for a finding that vests any and all interests in the land in the Plaintiffs and the United States as their representative and trustee. The Amended Complaints of Plaintiffs and the United States make clear that they consider the land at issue in this action to be Indian land, and thus an Indian reservation according to a broad definition of that term. *See Felix S. Cohen's Handbook of Federal Indian Law* Ch. 9, § Ala (1982) (outlining general principles of reservation status including the fact that some reservations are created not by formal statute but by treaty).

The complexity and uncertainty as to the status of the disputed lands lends support to Defendants' argument that their disestablishment counterclaim should not be dismissed. Substantial issues of fact and law remain to be determined as to the status of the disputed land. These issues cannot be determined as a matter of law at this time. Defendants' disestablishment counterclaim presents a substantial controversy appropriately determined in connection with the other legal issues in this action. For this reason, the Court declines to dismiss Defendants' disestablishment counterclaim on the ground that it is inappropriately asserted as a request for declaratory judgment or that it is not ripe for review.

### 3. *Validity of Counterclaim*

Both Plaintiffs and the United States attack Defendants' disestablishment counterclaim based on its validity under Rule 12(b)(6). Plaintiffs argue that Defendants' claim fails to state a cause of action as a matter of law based on the treaties under which the claim is brought. The United States argues that Defendants' counterclaim should be dismissed because Defendants assert no factual allegations against the United States in support of their disestablishment claim.[46] Under Rule 12(b)(6), Defendants' counterclaim will be dismissed only if it is clear that "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

### a. *Treaty of Ft. Schuyler*

■ Defendants' first theory of recovery with regard to their Counterclaim is that in the 1788 Treaty of Ft. Schuyler, between New York State and the Oneidas, the Oneidas ceded all of their New York land to New York State. In support of their argument, Defendants cite Article 1 of the Treaty, which states that "the Oneidas do cede and grant all their lands to people of the State of New York forever." Taylor Aff., Ex. 4. However, Defendants fail to read the Treaty as a whole, considering the other Articles of the Treaty along with Article 1. Article 2 specifically states that the Oneidas "hold to themselves and their posterity forever" the "reserved lands." *Id.* Treaties with Indians are to be interpreted as the Indians would have understood them. *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196, 119 S.Ct. 1187, 143

---

**46.** The United States argues that Defendants' counterclaim should be dismissed because no facts are asserted directly against the United States. The United States has cited no law in support of its argument nor has it expounded on its reasons for requesting dismissal on this basis. In its Amended Complaint, the United States puts the status of the disputed land directly at issue and claims that the Oneidas have a right to possess the land. In their disestablishment counterclaim, Defendants ask for a declaration regarding the status of that same land. The United States' argument that it should not be subject to a counterclaim by Defendants on this basis is rejected by the Court.

L.Ed.2d 270 (1999); *Oneida II,* 470 U.S. at 247, 105 S.Ct. 1245 ("[I]t is well established that treaties should be construed liberally in favor of the Indians.").

■ Defendants' interpretation of the Treaty of Ft. Schuyler simply makes no sense when considered the Treaty's words, later treaties, the United States' treatment of the Oneidas and their lands, and the fact that Defendants later purchased this very land from the Oneidas. In *Oneida II,* the Supreme Court acknowledged the effect of the Ft. Schuyler Treaty when it found that in the Treaty, "[t]he Oneidas retained a reservation of about 300,000 acres." *Oneida II,* 470 U.S. at 231, 105 S.Ct. 1245. This is the land at issue in this action. This land, which had been reserved to the Oneidas, was recognized in later treaties, including the 1794 Treaty of Canandaigua, on which this action is based. *See* Taylor Dec. Ex. 5. The land at issue was also recognized as Oneida land by New York State when the State purchased this land in a series of transactions from 1795–1846.

Construing the Treaty of Ft. Schuyler "liberally in favor of the Indians," as is required under law, and taking into account the findings and interpretations of courts that have addressed this issue previously, the Court finds that the Treaty of Ft. Schuyler cannot reasonably be understood to have divested the Oneidas of their aboriginal title in the subject lands. *See Oneida II,* 470 U.S. at 247, 105 S.Ct. 1245 (finding that "congressional intent to extinguish Indian title must be plain and unambiguous") (internal quotations omitted).

### b. *Treaty of Buffalo Creek*

Defendants claim that even if the Oneidas' interest in the disputed land was not disestablished by the Treaty of Ft. Schuyler, it was later disestablished by the 1838 Treaty of Buffalo Creek. Defendants contend that this Treaty was one of many obligatory removal treaties that disestablished tribal sovereignty over the land from which the Indians were to remove. In the Treaty of Buffalo Creek, the Oneidas were required to leave New York, give up lands that had previously been given to them in Wisconsin, and move to Kansas.

Regardless of the origin of the Oneida's land rights, whether they stem from aboriginal title that was never taken away, or whether they stem from federally-protected treaty rights, it is clear from the Treaties of Ft. Schuyler and Canandaigua that the Oneida were understood to have some form of possessory interest of use and occupancy in the land at issue in this action. The Treaty of Canandaigua acknowledges these rights clearly by stating that the federal government "acknowledges the lands reserved to the Oneida ... in their respective treaties with the State of New York, and called their reservations, to be their property." Taylor Aff., Ex. 5.

It is clear from Plaintiffs' briefs and Amended Complaint that they seek a return of the disputed land to full Indian and federal control, a status equivalent to a reservation. *See Felix S. Cohen's Handbook of Federal Indian Law* Ch. 9, § A (1982) (discussing Indian land ownership and the resulting reservation status of land under such ownership, and stating that such land is subject to federal, not state, jurisdiction). Plaintiffs state in their brief that " '[o]nce a block of land has been set aside for an Indian reservation,' as the United States did in the Treaty of Canandaigua, 'and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.' " Pls. Br. at 14 (quoting *Solem v. Bartlett,* 465 U.S. 463, 470, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984)). There is therefore no real dispute between the parties that the reservation status of the land is at

issue in this action. In addition, Plaintiffs' Amended Complaint, their arguments in support of their claims, the concrete actions they have taken once they own the land, and the actions they have taken against individual landowners, all lead to a conclusion that Plaintiffs are in fact seeking a finding that the land in dispute is reservation land. *See Oneida Indian Nation of New York v. City of Sherrill,* 145 F.Supp.2d 226, 238 (N.D.N.Y.2001) (stating plaintiffs' contention that the land at issue is part of the Oneida reservation set aside in the Treaty of Canandaigua). Resolution of Plaintiffs' claims requires a determination by the Court as to whether the federal government ever granted the Oneidas the subject land as their reservation and whether their rights in that land were ever taken away.

■ Defendants respond to Plaintiffs' claims with a counterclaim for disestablishment. Defendants argue that the Oneidas' reservation of land was effectively disestablished by language in the Treaty of Buffalo Creek indicating that the Oneidas living in New York would be removing to a "permanent home" in Kansas. Taylor Aff., Ex. 6 at Art. 2. In order to determine whether a reservation has been diminished or disestablished, it is necessary to look to (1) the statutory or treaty language used to open the Indian lands, (2) the historical context surrounding the congressional acts, and (3) the use and ownership of the lands since that time. *See Hagen v. Utah,* 510 U.S. 399, 410–11, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994) (quoting *Solem,* 465 U.S. at 470–71, 104 S.Ct. 1161); *see also Solem,* 465 U.S. at 471, 104 S.Ct. 1161 ("Where non-Indian settlers flooded into the open portion of a[n Indian] reservation and the area has long since lost its Indian character, we have acknowledged that *de facto,* if not *de jure,* diminishment may have occurred."). Defendants argue that application of these factors to this case requires the development of a full factual record and precludes dismissal of their disestablishment counterclaim as a matter of law. The Court agrees.

As an initial matter, there is some support for Defendants' argument that a removal treaty may disestablish an Indian reservation. In *Menominee Indian Tribe v. Thompson,* 943 F.Supp. 999 (W.D.Wis. 1996), the plaintiff Indian tribe sought a finding that it had aboriginal rights to hunt and fish without state restriction in certain lands located in Wisconsin. The court was called upon to interpret a removal treaty in the context of a motion to dismiss by the defendant. In that treaty, the plaintiff Indian tribe ceded and agreed to remove from its Wisconsin land within one year after ratification of the removal treaty. *Id.* at 1014. The removal treaty clearly stated that the tribe ceded all of its Wisconsin land in exchange for new lands in Minnesota. *Id.* The court found that the treaty language clearly anticipated removal of the tribe from the land at issue and extinguishment of the tribe's right to that land. *Id.* The court further stated that whether tribe actually removed from the land did not change the effect of the treaty. *Id.; see also New York Indians v. United States,* 170 U.S. 1, 26, 18 S.Ct. 531, 42 L.Ed. 927 (1898) (interpreting the treaty of Buffalo Creek and finding that "forfeiture is conditioned, not upon the actual removal of the Indians ... but upon their accepting and agreeing to removal"). Ultimately, the court found as a matter of law that the removal treaty disestablished the plaintiff tribe's usufructory rights in the land at issue. *See New York Indians,* 170 U.S. at 35–36, 18 S.Ct. 531; *see also Solem v. Bartlett,* 465 U.S. 463, 470, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984) (stating that "explicit language of cession and unconditional compensation are not prerequisites for a finding of diminishment") (citing *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977)); *see*

*also Thompson v. County of Franklin,* 987 F.Supp. 111, 125–27 (N.D.N.Y.1997) (applying the *Solem* factors and finding that an Indian reservation granted by treaty could be disestablished as a result of land conveyances by the Indian tribe).

The other two factors set forth in *Solem* and *Hagen* as necessary for a finding of diminishment or disestablishment are heavily fact-based, making dismissal of Defendants' counterclaim as a matter of law inappropriate at this time. Neither the history surrounding the Treaty of Buffalo Creek nor the history of the use and occupancy of the subject land is before the Court at this time. Plaintiffs and the United States instead rely mainly on their own interpretation of the treaties at issue to support their motions to dismiss Defendants' disestablishment counterclaim. Because the Court has determined that their interpretation of the treaties at issue is not the only legally viable interpretation, their arguments are insufficient to support a dismissal of Defendants' disestablishment counterclaim as a matter of law.

There is treaty language to support the arguments of both Defendants and Plaintiffs on the issue of disestablishment. The Treaty of Buffalo Creek was a removal treaty that referred to the Indians living in New York leaving that land for Kansas and making a new home there. However, the specific arrangements and deadlines for the Oneidas to remove to Kansas were never made, and in fact many Oneidas never left their land in New York and Wisconsin. In addition, the Treaty of Buffalo Creek refers only to the Oneidas giving up land in Wisconsin for land in Kansas; it does not mention any land in New York. The Supreme Court has found that in interpreting an ambiguous treaty, in order "to ascertain [a treaty's] meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the

parties." *Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 535, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991) (internal quotations omitted). Evidence of the intent and understanding of the parties at the time of contracting are not before the Court in their entirety. As a matter of law, the Court cannot find that the Treaty of Buffalo Creek conclusively supports the argument of either Defendants or Plaintiffs.

The Court agrees with Defendants that it cannot equitably dismiss Defendants' disestablishment counterclaims without fully considering the many issues relevant to a determination of reservation status. A resolution of these issues and a determination of the appropriate status of the land requires a full factual and historical record, something that was not before the court in the test case and something that is not before the court in *Sherrill.* Both of these cases dealt with small portions of the land at issue. In this action, the Court has the opportunity to make a comprehensive determination as to the status of the entire parcel of land claimed by the Oneidas. The Court does not take this responsibility lightly. It would not be appropriate at this point to dismiss Defendants' disestablishment claim.

### B. *Contribution*

#### 1. *Defendants' Standing*

The United States argues that Defendants lack standing to bring a claim for contribution because in doing so they are in fact attempting to bring a breach of trust case on behalf of Plaintiffs. The United States urges the Court to apply the standards governing third-party liability outlined in *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) to find that Defendants lack standing to bring their contribution claim.

 *Powers* is not applicable to this action. In *Powers*, the Supreme Court was confronted with the issue of whether a party had standing to assert the equal protection rights of a juror excluded from service. *Powers*, 499 U.S. at 410, 111 S.Ct. 1364. Defendants' counterclaim is brought as a claim for contribution against the United States as a third-party tortfeasor whom Defendants allege is jointly and severally liable for Plaintiffs' injury. As a third-party claim for contribution, Defendants have standing to bring their claim.[47]

 It is well established that the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), allows for contribution claims against the United States by an alleged tortfeasor, when both the United States and the alleged tortfeasor are jointly responsible for the same injury. *See United States v. Yellow Cab Co.*, 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951). The United States' liability is determined under the law where the alleged wrongful act occurred, in this case, New York. *See* 28 U.S.C. § 1346(b) (stating that the United States will be liable where a private person would be liable "in accordance with the law of the place where the act or omission occurred"). A tortfeasor's liability for contribution may stem from a breach of duty to the plaintiff. *See Schauer v. Joyce*, 54 N.Y.2d 1, 444 N.Y.S.2d 564, 429 N.E.2d 83 (1981) ("finding that under New York state law, the relevant question for contribution purposes is whether [the joint tortfeasor] and [the

defendant] each owed a duty to [the plaintiff] and by breaching their respective duties contributed to [the plaintiff's] ultimate injuries"). It is not necessary, as the United States claims, that Defendants assert that the United States breached a duty towards Defendants. In addition, a claim for contribution is valid even if the two tortfeasors are liable to the plaintiff under different theories of liability. *See Wood v. City of New York*, 39 A.D.2d 534, 330 N.Y.S.2d 923, 924 (N.Y.A.D. 1st Dept. 1972) (stating that the critical test for contribution is a shared responsibility for causing the same injury, even thought the theories of liability were different).

Defendants in this action have alleged that the United States breached a fiduciary duty owed to Plaintiffs. There is ample caselaw supporting a finding that the United States owed such a duty to the Oneidas during the time period relevant to this action. *See, e.g., United States v. Oneida Nation*, 201 Ct.Cl. 546, 477 F.2d 939, 940–42 (1973); *Oneida Indian Nation of New York v. United States*, 43 Ind. Cl. Comm. 373, 406–07 (1978); *Oneida Indian Nation of New York v. United States*, 26 Ind. Cl. Comm. 138, 145 (1971). While the United States may have some discretion in the help that it offers to Indian tribes as part of its fiduciary duty, this alone is not sufficient to defeat a finding that Defendants state a valid cause of action for contribution. *See Shoshone–Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C.Cir.1995) (finding that Attorney General had discretion as to

47. Counterclaims for contribution are permitted under Fed. Rule of Civ. Proc. 13(a) "in order to facilitate the litigation of all the claims arising from the same occurrences in the same lawsuit." *Index Fund, Inc. v. Hagopian*, 91 F.R.D. 599, 605 (S.D.N.Y.1981). This is despite the fact that a cause of action for contribution technically does not accrue until resolution and payment of the primary liability, and Rule 13(a) requires that a counterclaim state a claim the pleader had at the time of serving the pleading. *See Lynch v. Sperry Rand Corp.*, 62 F.R.D. 78, 90 (S.D.N.Y. 1973) (allowing a counterclaim for contribution because it arose "out of the occurrences which are the subject matter of the opposing plaintiff['s] claim" and because "[t]he Federal Rules of Civil Procedure are designed to encourage the litigation of all the claims arising out of the same occurrences in the same lawsuit").

144

whether or not the United States must asserts tribes' water rights on their behalf).

### 2. *Previous Adjudication of United States Liability*

 The United States claims that its liability as to Plaintiffs' claims in this action has already been litigated before the Indian Claims Commission ("ICC"), and thus may not be relitigated here.[48] The United States claims that the Oneidas' claims against it were adjudicated with finality and dismissed with prejudice. A closer look at the proceedings reveals that this representation by the United States is misleading. Defendants note that out of eight total claims, the claim referred to by the United States as being dismissed with prejudice is unrelated to the land at issue in this action. The claims that are related to the land in this action were voluntarily withdrawn by the Oneidas and dismissed without prejudice. Dismissal without prejudice has no res judicata effect and does not bar Defendants' counterclaim in this action.[49] *See Camarano v. Irvin,* 98 F.3d 44, 47 (2d Cir.1996). In addition, a third-party claim for contribution may lie even if the plaintiff's claim against the joint tortfeasor has been dismissed. *See Londino v. Health Ins. Plan of Greater New York, Inc.,* 93 Misc.2d 18, 401 N.Y.S.2d 950 (1977); *Conklin v. St. Lawrence Valley Educ. Television Council, Inc.,* 93–CV–984, 1995 U.S. Dist. LEXIS 3420, at *4 (N.D.N.Y. March 8, 1995) (finding that New York law allows for an action for contribution from parties even if they are not directly liable to the original plaintiff). In this action, the United States makes no

argument that it was found by any court to not be liable to Plaintiffs on any claim related to this action. In such a situation, there is no support for a dismissal of Defendants' claim for contribution.

### C. *Recoupment*

Defendants assert a counterclaim against the United States for recoupment of any damages they may be liable for as a result of this action. The United States argues that it is immune from suit on Defendants' recoupment claim. As discussed above, the Second Circuit has found that "[d]espite sovereign immunity, a defendant may, without statutory authority, recoup on a counterclaim an amount equal to the principal claim.... A counterclaim may be asserted against a sovereign by way of set off or recoupment to defeat or diminish the sovereign's recovery." *United States v. Forma,* 42 F.3d 759, 764 (2d Cir.1994). The United States argues that this legal principle, which would allow Defendants' recoupment counterclaim to proceed without specific statutory waiver, does not apply in this action because the United States is not suing on its own behalf and will not collect damages for itself from Defendants should it prevail.

There is some support for a finding that a defendant may not assert a counterclaim against a party in its individual capacity if that party brought suit in a representative capacity. *See United States v. Karlen,* 476 F.Supp. 306, 309 (D.S.D.1979) (dismissing counterclaim because "a permissive counterclaim may not be indirectly maintained against a Tribe by pointing it at the United States as Trustee for the Tribe").

**48.** In 1951, the Oneidas initiated a breach of trust action against the United States before the ICC titled *Oneida Indian Nation of New York v. United States.*

**49.** In addition, the United States was in fact found liable in the ICC action prior to the

voluntary withdrawal of the Oneidas' claims. This result tends to support, rather than detract from, Defendants' claim for contribution based on a breach of fiduciary duty towards the Plaintiffs. *See Oneida Indian Nation of New York v. United States* 43 Ind. Cl. Comm. 373, 407 (1978).

However, this principle does not apply to recoupment counterclaims such as the one asserted by Defendants. *See United States v. Timber Access Indus. Co.*, 54 F.R.D. 36 (D.Or.1971) (dismissing permissive counterclaims asserted against the United States in its individual capacity but allowing compulsory counterclaims sounding in recoupment to survive); *see also Klinzing v. Shakey's, Inc.*, 49 F.R.D. 32, 34 (E.D.Wis.1970) (finding that the "rule against counterclaiming plaintiffs who sue in representative capacity" is subject to exceptions and that the "controlling philosophy" behind counterclaims is to encourage parties to resolve all of their pending disputes in one action as long as the counterclaims are asserted against "real opponents" in the litigation).

The court's ruling in *Timber Access* supports a finding that Defendants' recoupment counterclaim is permissible. In *Timber Access*, the United States sued as a trustee for an Indian tribe. The defendant asserted counterclaims against the United States for recoupment as well as permissive counterclaims against the United States for money owned it under other contracts with the United States. The court found that the recoupment claims were valid and were not barred by sovereign immunity, but it dismissed the defendant's permissive counterclaims seeking affirmative relief from the United States because "in an action by a trustee, a counterclaim against the trustee in its individual capacity is not a claim against an opposing party under Rule 13." *Timber Access*, 54 F.R.D. at 38–39. Defendants' recoupment counterclaim in this action is not in the nature of a action against the United States in its individual capacity. Instead,

it relates directly to the events at issue in this action and seeks not independent recovery, but only a reduction of its potential liability.

■■■ The definition and description of recoupment as a form of recovery also supports the Court's findings. Recoupment is defined as a method by which a defendant may reduce the amount of damages it is liable to pay. *See* 20 Am. Jur.2d Counterclaim, Recoupment, and Setoff § 5 (1995). The focus of recoupment, therefore, is on the diminishment of a defendant's monetary liability, not on the plaintiff's recovery. The United States' suggestion that Defendants should assert their recoupment claim against the Plaintiffs in this action is therefore nonsensical. A recoupment claim is designed to allow a defendant to reduce its obligation to pay on a claim, so it is properly asserted against an opposing party that is liable to a defendant for part of the defendant's obligation.

Defendants' recoupment counterclaim against the United States is not subject to sovereign immunity. Therefore, the Court need not address the United States' argument that Defendants' recoupment counterclaim is improperly brought under the FTCA or that the FTCA statute of limitations applies to the claim.[50]

### D. *Declaration of Title*

Defendants' declaration of title counterclaim requests that the Court quiet title to the disputed lands. The United States once again argues that it is immune from suit on this issue.

---

**50.** Even if the Court were to consider the United States' argument, Defendants' recoupment counterclaim would not be subject to a statute of limitations defense. *See Reiter v. Cooper*, 507 U.S. 258, 264, 113 S.Ct. 1213,

122 L.Ed.2d 604 (1993) (finding that a statute of limitations defense is not applicable to counterclaim for recoupment as long as the main action is timely).

146

■ As discussed above, Defendants are entitled to direct counterclaims against the United States that sound in recoupment, encompassing those counterclaims that arise out of the same transaction and occurrence from which the United States' claims arise and that do not seek affirmative relief. Various courts have found that a defendant sued by the United States as representative for an Indian tribe, in an action to quiet title, may bring a counterclaim to quiet title in itself. *See United States v. Penn*, 632 F.Supp. 691, 692–93 (D.Vi.1986) (finding that defendant property owner could validly assert a counterclaim against the United States to quiet title in himself because the United States had brought suit in order to quiet title to land and as such defendant's claim sounded in recoupment and was not barred by sovereign immunity); *United States v. Drinkwater*, 434 F.Supp. 457, 461 (E.D.Va. 1977) (same); *United States v. Phillips*, 362 F.Supp. 462, 463 (D.Neb.1973) (same, where United States was suing as representative of Indian tribe). None of these courts have applied the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a(a), to a defendant's counterclaims, as urged by the United States in this action. While the United States has not specifically requested that the Court quiet title to the land at issue in this action, it is clear from the complaint of the United States that it questions Defendants' claims of title to the land and that the title status of the land is indeed being put at issue in this action.

Because the United States does not possess immunity as to counterclaims that arise out of the same claims raised by the United States in its complaint, the Court need not consider the United States' argument that Defendants' counterclaim is barred by the QTA.

E. *Taking*

Defendants' final counterclaim requests that in the event the United States obtains possession of the disputed lands, the United States should be ordered to pay the State just compensation for taking the State's property pursuant to the Fifth Amendment. The State bases this counterclaim on its interpretation of the 1788 Treaty of Ft. Schuyler. The State argues that in order for the Court to find that the Oneidas have a property interest in the disputed lands, the Court must necessarily find that the 1794 Treaty of Canandaigua granted the Oneidas a greater property interest than the Oneidas were granted by New York State under the Treaty of Ft. Schuyler.

■ Defendants simply cannot succeed on this claim. In order to state a takings claim, the State must establish that it possessed a property interest in the disputed lands that were taken from it by the United States. The issues surrounding Defendants' takings counterclaim have been ably addressed by Judge McCurn in *Cayuga Indian Nation of New York v. Cuomo*, 758 F.Supp. 107, 116 (N.D.N.Y.1991), and the Court finds his analysis compelling.

As in *Cayuga v. Cuomo*, the land at issue in this action was reserved to the Oneidas in a pre-Constitutional treaty and subsequently recognized and guaranteed by the United States in the Treaty of Canandaigua. Under these circumstances, Judge McCurn found that any actions taken by the State while the United States was operating under the Articles of Confederation are irrelevant to an interpretation of the rights conferred by the 1794 Treaty of Canandaigua. *See Cayuga v. Cuomo*, 758 F.Supp. at 116. Any rights possessed by the State prior to ratification of the Constitution "were ceded by the State to the federal government by the State's ratification of the Constitution." *Id.* Thus, the State could possess no property rights to the Oneida's land once it ratified the Constitution and thereby rec-

ognized the United States' exclusive authority over Indian land. Defendants in this action claim that the State possessed title to the land at issue pursuant to a pre-Constitutional treaty. However, "[o]nce New York State ratified the United States Constitution, relations with Indian tribes and authority over Indian lands fell under the exclusive province of federal law." *Id.* By arguing that the United States' recognition of the Oneida's land in the Treaty of Canandaigua was a taking rather than an assertion of federal control over Indian land by the United States, the State fails to acknowledge established federal law. This situation does not constitute a taking pursuant to the Fifth Amendment for which the State should be compensated.

### CONCLUSION

For the reasons stated above, it is hereby:

ORDERED that Defendants' motion to dismiss is **DENIED**; and it is further

ORDERED that Plaintiffs' motion to strike Defendants' defenses is **GRANTED IN PART AND DENIED IN PART** as discussed above; and it is further

ORDERED that Brothertown's motion to strike Defendants' defenses is **GRANTED IN PART AND DENIED IN PART** as discussed above; and it is further

ORDERED that the United States' motion for leave to file a motion to strike is **GRANTED**; and it is further

ORDERED that the United States' motion to strike Defendants' standing defenses is **GRANTED**; and it is further

ORDERED that the United States' motion for a stay of discovery is **DENIED AS MOOT**; and it is further

ORDERED that Plaintiffs' motion to dismiss Defendants' counterclaims is **DENIED**; and it is further

ORDERED that the United States' motion to dismiss Defendants' counterclaims is **GRANTED IN PART AND DENIED IN PART** as discussed above; and it is further

ORDERED that the Clerk of the Court shall serve copies of this order by regular mail upon the parties to this action.

IT IS SO ORDERED.